431 So.2d 627 (1983)
Jack BOYLES, Appellant,
v.
MID-FLORIDA TELEVISION CORP., et al., and Pat Beall, Appellees.
No. 82-701.
District Court of Appeal of Florida, Fifth District.
April 20, 1983.
Rehearing Denied May 23, 1983.
*630 Marcia K. Lippincott, P.A., and Elizabeth J. Gulden of Gulden, Heller & Sheaffer, Orlando, for appellant.
William G. Osborne of Robertson, Williams, Duane, Lewis & Ranson, P.A., and Richard Wilson, Orlando, for appellees.
COBB, Judge.
The appellant, Jack Boyles, brought a multiple-count action against the defendants below, Mid-Florida Television Corporation, et al. (Channel 9), and a television news reporter, Pat Beall. These various counts were either dismissed by preliminary motion or adversely adjudicated against the plaintiff by summary motion, and Boyles appeals.
The facts leading up to this appeal began in July, 1979, at which time a mentally retarded child, Curtis Duncan, died from head injuries while temporarily residing in a group home licensed by The Department of Health & Rehabilitative Services (H.R.S.) and operated by one Mildred Coffey, the mother of Jack Boyles. Boyles lived in the home and occasionally assisted in its operation, while at the same time working as an assistant at the Sunland facility for retarded patients. Boyles was not present at his mother's home when Curtis was injured.
As a result of the death, H.R.S. removed other children from Mrs. Coffey's home. Two H.R.S. workers, Joyce Ivancevich and Ira Ehrlich, were appointed to look into the death of Curtis Duncan and the licensing of the Coffey group home. As part of their inquiry, they prepared a document entitled "Social Summary on Mildred Coffey Family." A portion of that summary read:
Additional information of note is that the inquiry team went to Sunland to interview Jack Boyles, son of Mrs. Mildred Coffey, but were advised by him that he was advised by Mrs. Coffey's attorneys not to speak with us. The team reviewed his personnel file and spoke with individuals who supervised him. We were advised by Mrs. Pat Gleason, former supervisor, that Mr. Boyles had been charged by a client in Sunland of having sexually molested her but that she did not believe that allegation was valid. In addition, she stated that the one thing she could say about him that was negative was the fact that he used to tease the clients a great deal. She used an example that he teased one client to the point that she *631 would become angry and begin banging her plate on the table at which point he would laugh and get a big kick out of it. He had to be cautioned about this on more than one occasion.
On October 26, 1980, Channel 9 televised a report prepared by its news reporter, Pat Beall, purportedly an "update" on the death of Curtis Duncan. This telecast, based upon the HRS summary, showed a photograph of Boyles accompanied by a statement that he "had been repeatedly reprimanded while at Sunland for taunting the retarded patients in his care." On January 2, 1981, Channel 9 televised a second report prepared by Pat Beall. Again, a photograph of Boyles was shown, accompanied by the following statement:
[N]ow, questions about the foster group home have surfaced again. This time in connection with a worker in the home, Coffey's son ... it was here at Sunland that he was accused of raping one of the retarded patients. But HRS was forced to drop the charges. The patient was not verbal. An internal HRS memo into Curtis Duncan's death notes that Coffey's son had been reprimanded on a number of occasions for taunting the Sunland's clients while they ate. Mildred Coffey maintains that it was a feeding incident that caused the fatal blow to Curtis Duncan's head ... but the State Attorneys' office was given three different explanations of who was feeding Curtis Duncan at that time. One of which involved Coffey's son.
On February 13, 1981, Boyles's attorney complied with the provisions of section 770.01, Florida Statutes (1979), by writing a letter to the station manager of Channel 9 demanding a retraction. Instead of a retraction, Channel 9 published a third broadcast on February 23, 1981, as follows:
Mrs. Coffey's son, JACK BOYLES, has taken issue with statements made about him, including allegations that he assaulted a Sunland client and that he taunted Sunland Clients. Now, to clarify this matter, we now quote from an internal HRS memo (quoting) the inquiry team went to Sunland to interview Jack Boyles, son of Mildred Coffey, but were advised by him that he was advised by Mrs. Coffey's attorney not to speak with us. The team reviewed his personnel file and spoke with individuals who supervised him. We were advised by Mrs. Pat Gleason, former supervisor, that Mr. Boyles had been charged by a client in Sunland of having sexually molested her but that she did not believe that allegation was valid. In addition, she stated that the one thing she could say about him that was negative was the fact that he used to tease the clients a great deal. She used an example ... that he would tease one client to the point that she would become angry and then began banging her plate on the table, at which point he would laugh and get a big kick out of it ... he had to be cautioned about this on more than one occasion (unquote).
On March 2, 1982, Boyles brought suit against Pat Beall and the corporate owners of the television station. The ultimate complaint, with which we are now concerned, consisted of four counts: Count I was framed as a libel and slander action; Count II charged intentional infliction of mental distress; Count III asserted invasion of privacy; and Count IV, incorporating the prior allegations, sought punitive damages. The HRS "Social Summary" was attached as an exhibit to the complaint.
The trial court dismissed with prejudice Counts I and II  and Count IV as it related to them. Subsequently, final summary judgment was entered on Count III and the remainder of Count IV. This appeal ensued.

LIBEL
The material allegations of Count I (libel) are incorporated in paragraphs six through twelve of the complaint, as follows:
6. That on or about October 26, 1980, "CHANNEL 9", broadcasted to the public a report prepared by the Defendant, PAT BEALL, which purported to be an "update" on a previous story concerning Mrs. Mildred Coffey, mother of the Plaintiff, *632 JACK BOYLES. A child, Curtis Duncan, had died while under Mrs. Coffey's care in her home for mentally retarded children. The broadcast of October 26, 1980, showed a photograph of the Plaintiff, JACK BOYLES, and while the photograph was on the screen, the following statement was made concerning the Plaintiff:
"that her son, a worker at Sunland, had been repeatedly reprimanded while at Sunland for taunting the retarded patients in his care."
7. That the above allegation is false and defamatory per se, in that it alleges conduct incompatible with the exercise of the Plaintiff's profession as a Resident Life Assistant at the Sunland facility for retarded patients. The Plaintiff's occupation involves the care of many retarded patients. "CHANNEL 9", knew or should have known that the above statement was false and defamatory.
8. That on or about January 2, 1981, the Defendant, PAT BEALL, prepared a second report which was broadcasted by the Defendant "CHANNEL 9" on the same day. The broadcast of January 2, 1981, showed a photograph of the Plaintiff on the screen while the following statements were made:
"now, questions about the foster group have surfaced again. This time in connection with a worker in the home, Coffey's son ... . it was here at Sunland that he was accused of raping one of the retarded patients. But HRS was forced to drop the charges. The patient was not verbal. An internal HRS memo into Curtis Duncan's death notes that Coffey's son had been reprimanded on a number of occasions for taunting the Sunland's clients while they ate. Mildred Coffey maintains that it was a feeding incident that caused the fatal blow to Curtis Duncan's head . . but the State Attorneys' Office was given three different explanations of who was feeding Curtis Duncan at that time. One of which involved Coffey's son."
9. That the above allegations are false and defamatory for the following specific reasons:
(a) The words quoted above imply that the Plaintiff was a suspect in the death of Curtis Duncan.
(b) The words imply that the Plaintiff was a habitual tormentor of retarded patients.
(c) The words imply that the Plaintiff raped a patient in his care at Sunland and escaped punishment therefor, because the patient was unable to communicate.
(d) The words imply that the incident involving the rape accusation was recent in origin and had prompted the news report of January 2, 1981.
10. That all of the above allegations are false. The Defendant, PAT BEALL, knew or should have known of the falsity of the allegations when the report was prepared for broadcast. Further, there was no good motive by the Defendant for the publication of the broadcast of January 2, 1981.
11. That the above allegations constitute libel per se, and slander per se, in that they accuse the Plaintiff of conduct incompatible with the exercise of his profession as a Resident Life Assistant at Sunland, and they accuse him of acts of moral turpitude; specifically, taking sexual advantage of patients in his care who are unable to resist or defend themselves.
12. That as a result of the above described defamation the Plaintiff, JACK BOYLES, has suffered mental pain and anguish, damage to his reputation, humiliation and depression, and an impairment of his ability to seek employment in his field at an institution other than the one at which he is currently employed.
The ruling of the trial court in dismissing Count I apparently was prompted by a two-fold argument of the defense: (1) the tort of libel per se no longer exists in regard to defamation actions against the media as a result of the United States Supreme Court decision in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); and (2) if such a cause of action *633 does exist, the plaintiff's complaint herein fails to allege it because of its reliance on innuendo, which is superfluous in an action for libel per se. We will consider these two possible bases for the trial court's dismissal of Count I seriatim.
First, we do not agree that Gertz has eliminated causes of action against the media in Florida for libel per se, as contended by appellee. But see, From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981), review denied, 412 So.2d 465 (Fla. 1982). It merely added pleading and proof requirements (fault and actual damage) for a per se action by a private individual. A distinction still remains between libel per se and libel per quod: the necessity in the latter action for pleading and proving the innuendo.
The Florida Supreme Court explained the difference between defamation per se and per quod in Piplack v. Mueller, 97 Fla. 440, 121 So. 459 (Fla. 1929):
The declaration states a cause of action based upon words used by defendant and applied to plaintiff which were defamatory in character. Some of the words were actionable per se; others were actionable per quod. That is to say, some of the words upon their face and without the aid of extrinsic proof were injurious, they were defamatory per se. Other words used were not on their face in their usual and natural signification injurious, but were only so in consequence of extrinsic facts. Those words required an innuendo.
121 So. at 459. See also: Commander v. Pedersen, 116 Fla. 148, 156 So. 337 (Fla. 1934).
"Innuendo" simply means that facts extrinsic to those published must be known in order to inflict an injury. While Gertz has abolished one distinction between libel per se and libel per quod in an action by a private individual against the media  the presumption of damage  it has not abolished the distinction in regard to innuendo. Therefore, it has not abolished the tort of libel per se.
Given the existence of the tort, we proceed to the second basis upon which the dismissal of Count I may have been granted by the trial court: failure to state a cause of action. Any consideration of the sufficiency of the complaint must begin with an analysis of Gertz.
The primary holding in Gertz, receding from the plurality opinion in Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), was that a newspaper or broadcaster publishing defamatory falsehoods about an individual who is neither a public official[1] nor a public figure[2] may not claim a constitutional privilege against liability, for injury inflicted, on the ground of a privilege protecting discussion of any public issue without regard to the status of a person defamed thereon. There is no dispute in the instant appeal as to the status of Jack Boyles based on the pleadings: he is neither a public official nor a public figure, but a private individual.
In Gertz, the United States Supreme Court held that recovery for presumed or punitive damages is prohibited if liability is not based on a showing of knowledge of falsity or reckless disregard for truth  the "actual malice" standard from New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). 418 U.S. at 349, 94 S.Ct. at 3011. The Court stated that plaintiffs who do not prove actual malice are limited to compensation for actual injuries only. As to what "actual injury" includes, the Court stated:
Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehoods include impairment of reputation and standing in *634 the community, personal humiliation, and mental anguish and suffering.
418 U.S. at 350, 94 S.Ct. at 3012.
The Court also held that states may define for themselves the appropriate standard of liability for the publisher or broadcaster of defamatory falsehoods injurious to a private individual, so long as they do not impose liability without fault. 418 U.S. at 347, 94 S.Ct. at 3010. As for the fault required under Florida law in order for a private individual to recover actual damages, the appropriate standard after Gertz is negligence  i.e., publication of false and defamatory statements without reasonable care to determine their falsity. Tribune Co. v. Levin, 426 So.2d 45 (Fla. 2d DCA 1982); Miami Herald Publishing Co. v. Ane, 423 So.2d 376 (Fla. 3d DCA 1982); Cape Publications, Inc. v. Teri's Health Studio, Inc., 385 So.2d 188 (Fla. 5th DCA 1980); see also: Florida Standard Jury Instructions in Civil Cases, M.I. 4.3.
In the instant case, the plaintiff clearly alleged in his complaint that the broadcaster knew or should have known that the statements were false and defamatory, thereby meeting the standard of negligence. The plaintiff also met the burden in regard to pleading damages. In paragraph 12 of the complaint, the plaintiff states that he has suffered mental pain and anguish, damage to his reputation, humiliation and depression, as well as an impairment of his ability to seek employment as a result of the defamation. Clearly, this provides a basis for actual injury as that term is defined in Gertz. Additionally, under Count IV, wherein the plaintiff incorporates Count I by reference, the plaintiff alleges that the acts were performed with malice and in reckless disregard of the rights of the plaintiff, and that the defendants had knowledge of the statements' falsity, which they disregarded. This meets the Gertz-New York Times standard for actual malice as a prerequisite for the punitive damage claim.
The allegations of negligence, malice, and damages as set forth above, however, must be predicated upon a sufficient allegation of libel. In that regard, we look to the libel alleged by the plaintiff, which centers around two broadcasts. The first, on October 26, 1980, included the following statement regarding the plaintiff:
That her son, a worker at Sunland, had been repeatedly reprimanded while at Sunland for taunting the retarded patients in his care.
The second broadcast, occurring on January 2, 1981, as set out in the complaint, stated:
Now, questions about this foster group have surfaced again. This time in connection with a worker in the home, Coffey's son... . It was here at Sunland that he was accused of raping one of the retarded patients. But HRS was forced to drop the charges. The patient was nonverbal. An internal HRS memo into Curtis Duncan's death notes that Coffey's son had been reprimanded on a number of occasions for taunting the Sunland's clients while they ate. Mildred Coffey maintains that it was a feeding incident that caused the fatal blow to Curtis Duncan's head ... but the state attorney's office was given three different explanations of who was feeding Curtis Duncan at that time. One of which involved Coffey's son.
Pre-Gertz, libel per se was generally seen when a statement considered alone, without innuendo:
[C]harges that a person has committed an infamous crime; charges a person with having an infectious disease; tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or tends to injure one in his trade or profession.
Richard v. Gray, 62 So.2d 597 (Fla. 1953).
Here, the first statement, which states that the son was reprimanded repeatedly for taunting the retarded patients, clearly tends to injure Boyles in his profession or trade, which is taking care of mentally retarded children. Additionally, it is something that would tend to subject one to contempt or disgrace. No innuendo is needed to see the defamatory meaning of the *635 words; rather, the words themselves, as the common mind would naturally understand them, convey the defamatory meaning. See Richard.
The second broadcast, which states that Boyles was accused of raping one of the retarded patients, clearly falls within the categories of libel per se, and needs no innuendo to convey its harmful meaning. Looking solely at the complaint, as must be done in a motion to dismiss, libel per se clearly can be seen.
It would appear from the record, and more particularly from the defense motion to dismiss the libel count, that the trial court may have accepted the argument that words which imply a libelous meaning, rather than directly stating it, must be classified as libel per quod rather than libel per se. This argument, although successful below, is entirely specious. It confuses the legal meaning of innuendo. The point is well made in a perceptive 1975 Law Review article published by the University of Virginia:
Courts have frequently confused the quite normal proposition that a statement which may be defamatory by implication is actionable only if it conveys a defamatory meaning to ordinary persons, with the situation where extrinsic facts must be supplied to illuminate the defamatory meaning of the statement. In the latter situation the extrinsic facts must be pled by way of the "inducement" and the defamatory meaning with reference to those facts by way of "innuendo." The technical pleading term "innuendo" has been transported in its generic sense to the former situation, and statements with defamatory implications which need no extrinsic facts to illuminate their defamatory meaning have been inappropriately classified as actionable per quod. See e.g., Piver v. Hoberman, 220 So.2d 408 (Fla.App. 1969)... .
Eaton, "The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond. An Analytical Primer," 61 Va.L. Rev. 1349, 1350-52 (1975).
The trial court, in looking at the complaint, and the allegations contained therein, erred by dismissing the complaint as to Count I for failing to state a cause of action for libel per se. It also erred in dismissing the punitive damage claim for libel in Count IV. Libel per se is still a good cause of action in Florida, and the words used in the complaint are not such that they require innuendo to have a defamatory meaning. Rather, they are defamatory on their face, thus actionable as libel per se. Given the added allegation of malice in Count IV, a claim for punitive damages is also stated.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Appellant claims in his second point on appeal that the trial court erred by dismissing Count II of the complaint, which he alleges sets forth a cause of action for intentional infliction of emotional distress. Boyles contends that the statements made by Channel 9, as outlined above, were done in reckless disregard of his rights, and that the reporter knew or should have known they would cause emotional distress to the plaintiff. Appellee, in its motion to dismiss, claimed that there were insufficient allegations to support a cause of action for intentional infliction of emotional distress in that the allegations did not meet the standard of outrageousness required for such an action.
The arguments directed to this issue on appeal concern themselves with whether or not the alleged conduct of the defendants is sufficiently "outrageous" so as to serve as a predicate for an independent action for intentional infliction of emotional distress. See, e.g., Habelow v. Travelers Insurance Co., 389 So.2d 218 (Fla. 5th DCA 1980); Food Fair, Inc. v. Anderson, 382 So.2d 150 (Fla. 5th DCA 1980). In the dismissed Count II, it is alleged that Pat Beall and Channel 9 implied in several television broadcasts that Jack Boyles was a murderer, rapist and cruel individual who taunted mentally retarded patients in his care, knowing that such was false. It seems relatively easy to classify such alleged conduct by the defendants as "outrageous"  or *636 at least to say that a jury reasonably could make that finding upon a proper evidentiary basis.
But the problem with Count II, as we view it in the factual context alleged in this case, is that it does not set forth an independent tort for the recovery of damages for emotional distress. That factor has been an intrinsic, historic aspect of the tort. See LaPorte v. Associated Independents, Inc., 163 So.2d 267 (Fla. 1964); Slocum v. Food Fair Stores of Florida, 100 So.2d 396 (Fla. 1958); Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950). The "outrageous conduct" alleged here is defamation, which gives rise to various elements of damage, including personal humiliation, mental anguish and suffering. See Gertz, 418 U.S. at 350, 94 S.Ct. at 3012. In other words, the allegations of this count describe the tort of libel while characterizing it as "outrageous conduct." As such, it is merely an imperfect repetition of Count I. Therefore, Count II was properly dismissed, albeit for the wrong reason.

INVASION OF PRIVACY
The third point on appeal concerns the correctness of the trial court's summary judgment against the plaintiff on his count for invasion of privacy. In the complaint under Count III, the plaintiff alleges:
[T]hat the publication of January 2, 1981, of the fact that the plaintiff was accused of raping a mentally retarded patient was a private fact which was not worthy of public broadcast, and its broadcast constituted invasion of plaintiff's privacy. The accusation of rape occurred some four-and-a-half years before the public broadcast of the fact on the defendant's television station on January 2, 1981, which was prepared and/or reported by Pat Beall.
In the motion for summary judgment, the defendant notes that the plaintiff's sole factual allegation for invasion of privacy is contained in the above paragraph, and consists of an action for making public a private fact. The defendant contended that since the publication of January 2 was taken verbatim from a public document, the HRS summary, which was attached to the complaint, no grounds for invasion of privacy exist. The court granted the motion for the summary judgment, finding that the social summary report was a public document, and as such cannot give rise to a cause of action for invasion of privacy for the publication of such document. The court noted, however, that since the wording of the document was indeed changed by the defendant, the plaintiff does have a cause of action for either negligent or intentional misrepresentation of said public document, and gave the plaintiff twenty days to file an amended complaint to reflect such a case. After the plaintiff announced that he chose not to do so, the court entered a final summary judgment.
The first question that must be addressed is whether or not the trial judge was correct in his determination that the social summary report was indeed a public record. The appellant contends that the social summary and the information contained therein are not a public record, pursuant to section 827.07(15), Florida Statutes (1981),[3] which allows for confidentiality in matters dealing with child abuse. The statute's purpose is stated in section 827.07(1), which states:
LEGISLATIVE INTENT.  The intent of this section is to provide for comprehensive protection services for abused or neglected children found in the state by requiring that reports of each abused or neglected child be made to the Department of Health & Rehabilitative Services in an effort to prevent further harm to the child or any other children living in the home and to preserve the family life *637 of the parents and children, to the maximum extent possible, by enhancing the parental capacity for adequate child care.
Here, the summary report falls outside the coverage of this particular statute. While the summary was made following the death of the child, it was not an investigation into the child's death, nor was it an attempt to insure that the other children were taken care of.
The appellee contends the summary is a public record, since it was compiled during a licensing investigation of the facility and, therefore, falls under section 393.067(6), Florida Statutes (1981),[4] which allows for inspection reports of such facilities to be made public. If we consider it a licensing investigation, which seems the more reasonable classification, it is a public document pursuant to section 393.067(6). Therefore, no right of privacy regarding disclosure of private matters could be claimed by Boyles. Shevin v. Byron, Harless, Schaffer, Reid & Assoc., Inc., 379 So.2d 633 (Fla. 1980); Douglas v. Michel, 410 So.2d 936 (Fla. 5th DCA 1982). See also Cox Broadcasting v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Similarly, if the report was merely part of an investigation into whether the HRS acted properly in removing the children from the home, in effect a review of HRS's own performance, then it would fall within section 119.011(1), Florida Statutes (1981),[5] and be a public record.
One additional element is present in the discussion of invasion of privacy. The broadcast of January 2, 1981, on which the plaintiff bases Count III, did not quote directly from the HRS summary; rather, it changed one word and added a sentence. The original summary stated in pertinent part as follows:
We were advised by Mrs. Pat Gleason, former supervisor, that Mr. Boyles had been charged by a client in Sunland as having sexually molested her but she did not believe the allegation was valid.
The broadcast stated as follows:
[T]his time in connection wth a worker in the home, Coffey's son ... it was here at Sunland that he was accused of raping one of the retarded patients. But HRS was forced to drop the charges. The patient was not verbal... .
The fact that the alleged statement taken from the public document was false does not seem to matter under the count as stated by the appellant. He only claims an invasion of privacy due to publication of private facts. If, indeed, the facts are false, a cause of action in libel (as was brought in Count I) or for "false light" invasion of privacy would seem to be the proper course. Here, the appellant did not amend his complaint, as he was allowed to do, to state a claim concerning the misrepresentation of the public records and a claim for invasion of privacy thereunder. Therefore, the fact that the publication was false would not seem to matter as the count is worded. Since the HRS summary was a public record, the summary judgment as to Count III was correct.

DISCOVERY ISSUES
Several discovery issues are raised on appeal and cross-appeal. First, the appellant contends the trial court erred by denying his motion to compel Channel 9's general manager, Walter Windsor, to answer questions dealing with the third broadcast (February 23, 1981), on which the verbatim HRS summary was read. Channel 9 contends the trial court's ruling was proper, since the questions concerned matters covered by the attorney-client privilege. In his deposition, *638 Windsor claims that he reviewed the first two broadcasts as a result of the letter sent by the plaintiff's attorney demanding a retraction some ten days prior to the third broadcast. He said that all the discussions concerning the content and intent of the third broadcast took place with counsel for Channel 9, and were therefore protected by the attorney-client privilege. In all, the privilege was claimed during the deposition for nine questions, which were certified by plaintiff's counsel. The questions Windsor refused to answer based on the attorney-client privilege were as follows:
1. Why was the broadcast of February 23, 1981, done?
2. Why did you decide to run a broadcast at all?
3. What were you thinking when you decided to run this broadcast about Jack Boyles?
4. Why did you not decide just to do nothing with response to the complaint rather than run this broadcast?
5. Who had the final decision on putting on the air this broadcast of February 23, 1981?
6. What was your intent in allowing the broadcast of February 23, 1981, to be made?
7. Did you realize, when you broadcast the February 23, 1981 broadcast, that it would contain information about Jack Boyles that would subject him to ridicule and contempt in the eyes of the viewer?
8. Why didn't you just refuse to do anything as opposed to running another broadcast which would again malign Jack Boyles?
9. Why did you not include in the broadcast of February 23 any clarification of the charge that Jack Boyles was involved with Curtis Duncan's death?
Appellant contends that the United States Supreme Court's decision in Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), requires that the questions be answered to determine the broadcaster's state of mind prior to the broadcast. In Herbert, the Supreme Court held that plaintiffs in libel actions could inquire directly from media defendants whether they knew or suspected that their damaging publication was in error. The Court felt this was necessary to allow such plaintiffs to discover the "actual malice" which they need to prove in such cases. Actual malice is still at issue in this case, even though the plaintiff is a private individual, because of the punitive damage claim relating to libel in Count IV.
The appellee contends that even if Herbert is applicable, it should not apply here since the communications were protected by the attorney-client privilege. Section 90.502(2), Florida Statutes (1981), states:
A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client.
The essentials of the attorney-client privilege are stated in 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961), as follows:
(1) Where legal advice of any kind is sought
(2) from a professional legal advisor in his capacity as such,
(3) the communication relating to that purpose,
(4) made in confidence
(5) by the client,
(6) are at his insistence permanently protected
(7) from disclosure by himself or by the legal advisor,
(8) except if protection be waived.
The traditional situation in which the attorney-client privilege is brought up is where an attorney is being forced to testify as to something said by the client; however, the privilege extends to statements made by the attorney to the client as well. Ordinarily, the compelled disclosure of an attorney's communications or advice to the client will effectively reveal the substance *639 of the client's confidential communication to the attorney. To prevent this result, the privilege normally extends both to the substance of the client's communication, as well as the attorney's advice and response thereto. Matter of Fischel, 557 F.2d 209 (9th Cir.1977).
This privilege does not extend, however, beyond the substance of the client's confidential communications to the attorney. An attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction. Fischel at 211-12. See also U.S. v. Goldfarb, 328 F.2d 280 (6th Cir.), cert. denied, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964).
Here, the privilege is invoked to avoid questions as to policy rationales behind programming decisions. No actual communications are sought by the questions, but rather only the reasons for the decisions that were made. The answers sought to be protected here go beyond the attorney-client privilege and, based on Herbert, the trial court erred in denying the motion to compel.
Appellees Channel 9 and Pat Beall filed cross-appeals on two pre-trial motions in which the trial court ruled for the plaintiff. Their first point on cross-appeal concerns the trial court's denial of a motion for a mental examination of plaintiff, Jack Boyles, entered on September 25, 1981.
In the motion for mental examination, Channel 9, pursuant to Florida Rule of Civil Procedure 1.380, moved to compel the plaintiff to submit to a mental examination. As grounds for the motion, the defendant contended that since the plaintiff alleged in his complaint that he suffered "mental pain and anguish, humiliation and depression as a result of the alleged defamation," he has put his mental condition into controversy. The defendant contended that the plaintiff's mental condition could not be adequately investigated without expert medical testimony, and that the plaintiff's mental condition and history had become a critical element in the defendant's defense of the lawsuit. The defendant also noted that he had requested the plaintiff to voluntarily submit to a mental examination, but the plaintiff refused.
Florida Rule of Civil Procedure 1.360(a) provides for mental examination of parties as follows:
When the mental or physical condition, including the blood group, of a party or of a person in the custody or under the legal control of a party is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce the person in his custody or legal control for examination. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.
The two essential prerequisites to a compulsory mental examination that must be manifested are (1) that the subject's mental condition is "in controversy"  i.e., directly involved in some material element of the cause of action or a defense; and (2) that "good cause" be shown  i.e., that the mental state of the subject, even though "in controversy," cannot adequately be evidenced without the assistance of expert medical testimony. Gasparino v. Murphy, 352 So.2d 933 (Fla. 2d DCA 1977). These essential requirements are not met by mere conclusory allegations of the pleadings  nor by mere relevance to the case  but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); Kristensen v. Kristensen, 406 So.2d 1210 (Fla. 5th DCA 1981).
In all the cases cited, the mental examination has been requested to deal with mental problems, i.e., mental illness, psychoses, etc., and not merely with humiliation *640 or depression which is felt as a result of defamation as here. While a mental examination may be proper in a defamation action, Gordon v. Davis, 267 So.2d 874 (Fla. 3d DCA 1972), it is so only where the mental element is at issue. In Gordon, the alleged defamation dealt with the plaintiff being called "psychotic." Clearly, evidence of his being a psychotic would prove the truth of the allegation and thereby allow a clear affirmative defense for the defendant. In the instant case, there is no allegation that the plaintiff is a psychotic or otherwise mentally disturbed. The only mental harm mentioned is the mental anguish the plaintiff claims as a result of the defamation, and goes only to proof of damages, not to proof of the defamation itself. Indeed, it is questionable that mental anguish is a subject for "expert" testimony. If a mental examination of Boyles were proper to evaluate his mental anguish, then such an examination of Windsor and Beall would be equally available to evaluate their mental malice. In any event, it is clear that a mental exam is not warranted here, and that the trial court, in its discretion, ruled properly in denying the defendant's motion.
In cross-appellants' final point, they contend the trial court erred in denying a motion to compel discovery relating to Jack Boyles' alleged homosexual status. During a deposition of Jack Boyles, the defendant Beall's attorney inquired as to whether the plaintiff was a homosexual or pursued a gay lifestyle. After the question was objected to by plaintiff's counsel, the question was certified. The defendant moved to compel discovery and the trial court, denying the motion, stated:
That defendant, Pat Beall's, motion to compel discovery specifically directed to the pursuit of questions regarding the plaintiff's homosexual status or alleged homosexual status is hereby denied. The Court specifically finds that even if the plaintiff's homosexual status is relevant to his claim for loss of reputation that the inflammatory nature of said evidence outweighs its probative value.
At the hearing on this issue, the defense attorney attempted to show that the depression that Boyles allegedly suffered as a result of the defamation could have indeed been part and parcel of his homosexual lifestyle, and that in addition, the question of his homosexual status goes to his reputation in the community, which the defendants contend would be low if indeed he were a homosexual. The defendants claimed that since Boyles's character was an essential element in the case, evidence of that character would therefore be admissible. Plaintiff's counsel pointed out that the fact of homosexuality had nothing to do with the alleged defamation relating to rape and child abuse, and that the only use the defendant would have for it would be as prejudicial material against the plaintiff.
The plaintiff's general character and reputation may be established in actions of libel or slander in the same manner as in other civil actions. The proof must be confined to reputation with respect to the fault or trait of character involved in the imputation charged. Particular instances of misconduct are inadmissible to prove plaintiff's general bad character. 53 C.J.S. Libel & Slander § 210 (1948). See also 50 Am.Jur.2d Libel & Slander § 381 (1970).
The cases cited by cross-appellants concerning the propriety of allowing evidence as to the plaintiff's reputation are not applicable here. In Roper v. Mabry, 15 Wash. App. 819, 551 P.2d 1381 (1976), the evidence of reputation sought to be disclosed dealt with a finding of fraud on the part of the plaintiff in a prior suit. The court disallowed this particular act testimony, but allowed testimonial proof as to the plaintiff's reputation for fraud in the community. In Roper, the alleged defamation concerned the plaintiff being called a "thief." Similarly, in Vojak v. Jensen, 161 N.W.2d 100 (Iowa 1968), the plaintiff was allegedly libeled in a letter accusing him of defective workmanship. The defendant sought to introduce evidence of a suit based on alleged incompetency in work on the part of the plaintiff in 1960. The court noted that the sole purpose for such testimony was for mitigation of damages, as it had no bearing *641 on whether or not the statement was indeed libelous. The court held that the defendant could show that the plaintiff's general reputation as a builder was tarnished prior to the libel conviction, but could not do so solely on an isolated incident.
In both these cases, the tarnish to the reputation takes the form of the subject in which the libel rests. In the instant case, the libel concerns rape and child abuse, and has no bearing whatsoever as to the plaintiff's alleged homosexual status. Additionally, asking the plaintiff whether or not he was a homosexual does not meet the requirements for reputation testimony  rather, the inquiry should be what effect such a status, if indeed it were true, has on the community's view of the plaintiff. In any event, the trial court ruled that such testimony, even if relevant, would be barred due to its inflammatory nature outweighing its relevance. The trial court has great discretion in matters of discovery, and abuse must be shown in order to reverse. Levenson v. Barnett Bank of Miami, 330 So.2d 192 (Fla. 3d DCA 1976). In the instant case, it is clear that the goal of the defense was to prejudice the plaintiff rather than to obtain legitimate discovery. The trial court ruled properly in denying the motion to compel.

CONCLUSION
The trial court erred in dismissing Count I of the complaint for libel per se, since that still is a valid cause of action in Florida, and the defamation alleged was libelous upon its face, without any need for innuendo. The dismissal of Count I is reversed. The lower court's ruling dismissing Count II (intentional infliction of emotional distress) was correct, as was its ruling on the summary judgment for invasion of privacy under Count III. The dismissal of Count IV as it relates to Counts II and III is affirmed, and the dismissal of Count IV as it relates to Count I is reversed. The order denying the motion to compel Channel 9's manager to answer the certified questions concerning the third broadcast is reversed. Neither cross-appellants' request for a mental examination for the plaintiff nor inquiry into plaintiff's alleged homosexual status warrants compelling discovery, and these rulings by the trial court are affirmed.
AFFIRMED in part; REVERSED in part; and REMANDED.
ORFINGER, C.J., and DAUKSCH, J., concur.
NOTES
[1] New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[2] Curtis Publishing Co. v. Butts, Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
[3] § 827.07(15)(a) states:

In order to protect the rights of child and his parents or other persons responsible for the child's welfare, all records concerning reports of child abuse or neglect, including reports made to the abuse registry and to local offices of the Department and all records generated as a result of such reports, shall be confidential and exempt from the provisions of section 119.07(1), and shall not be disclosed except as specifically authorized by this section.
[4] § 393.067(6) states:

The Department may conduct unannounced inspections to determine compliance by residential facilities with the provisions of this chapter and the rules adopted pursuant thereto. The facility shall make copies of inspection reports available to the public upon request.
[5] This section defines public records as:

[A]ll documents, papers, letters, maps, books, tapes, photographs, films, sound recordings or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency.