**Dick KING, Plaintiff,**

v.

**James H. BURRIS, a/k/a Jim Burris, et al., Defendants.**

**Civ. A. No. 82–K–2073.**

United States District Court,
D. Colorado.

June 14, 1984.

Alan H. Bucholtz, Denver, Colo., for plaintiff.

William L. Senter, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

If I were capable of complete judicial restraint, I would begin this opinion by stating that this is an action for damages based upon allegations of intentional infliction of severe emotional distress and defamation. Then I would say that the matter is before me on the defendants' motion for summary judgment. I would summarize the doctrines governing summary judgment and make due obeisance to the unshakeable precept that to grant summary judgment there may not exist any genuine issue of material fact. Then, to show I know where it is I am about, I would recount that I must resolve all doubts in favor of the nonmoving party before deciding whether an actionable claim is set forth.

But this is not just a case about damages; this case is about baseball! Even the Supreme Court of the United States cannot restrain itself when confronted with mankind's noblest achievements on "Hoboken's Elysian Fields."[1] I think it too much to expect a mere tyro on the district bench to cleave to the issues in the face of that august example.

For almost a century, baseball has been America's national pastime. From Babe Ruth's "called shot" to Carlton Fisk's twelfth inning home run to win the sixth game of the 1975 World Series, baseball has sparked the imaginations of generations of Americans. Though changes have occurred which make grown men cry, its essence remains unchanged.[2] Baseball is

1. See Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972), where Justice Blackmun wrote:
It is a century and a quarter since the New York Nine defeated the Knickerbockers 23 to 1 on Hoboken's Elysian Fields June 19, 1846, with Alexander Jay Cartwright as the instigator and the umpire. The teams were amateur, but the contest marked a significant date in baseball's beginnings. That early game led ultimately to the development of professional baseball and its tightly organized structure.... The ensuing colorful days are well known.... [O]ne recalls the appropriate reference to the "World Serious," attributed to Ring Lardner, Sr.; Ernest L. Thayer's "Casey at the Bat"; the ring of "Tinker to Evers to Chance"; and all the other happenings, habits, and superstitions about and around baseball that made it the "national pastime" or, depending on the point of view, the "great American tragedy."

407 U.S. at 260–64, 92 S.Ct. at 2101–03 (footnotes omitted).

2. The designated hitter rule and artificial turf have succeeded the lively ball and night games as the game's pre-eminent controversies. Sparky Anderson said of the designated hitter rule: "I've changed my mind about it. Instead of being bad, it stinks." After a solid career, Dick Allen is most renowned for his comment: "If horses don't eat it, I don't want to play on it." Dave Lemonds of the Chicago White Sox once said that playing on artificial turf "is like playing marbles in a bathtub."
Despite the changes and complaints, visitors to modern ballparks witness a sport that has maintained its noble fascination since the nineteenth century. Bill Veeck, baseball's notorious promoter, said that "Baseball is almost the only orderly thing in an unorderly world. If you get three strikes, even the best lawyer in the world can't get you off."

uniquely unconstrained by clocks and time-keepers.[3] Perhaps as a result, baseball's memories are the most vivid, and many of our fondest recollections are of afternoons and evenings at the ballpark.

Baseball mirrors our foibles and fallibilities. The game has survived the Black Sox scandal of 1919, striking umpires, striking players, drug and alcohol problems, and even perhaps George Steinbrenner.

The matter before the court stems from one of the less memorable events in the history of the game—an argument at the 1981 winter meetings of the American Association of Professional Baseball Clubs. Plaintiff Dick King and defendant Jim Burris attended the meetings in their capacities as president and general manager of the Wichita Aeros and the Denver Bears, respectively. King and Burris did not agree on several issues, including league expansion and scheduling for the upcoming season. At one point in the December 5 session, Burris lost his temper and hurled a barrage of verbal beanballs at King. The parties agree that the epithets included: "damn fat fag," "fatso," "liar," "I ought to hit you in the mouth," and "why don't you do the game of baseball a favor and resign." According to King, Burris then swore at him and threatened him with a Sprite bottle.[4]

King alleges that as a direct result of Burris' actions, he resigned from his position and was forced to seek medical consultation and counseling. He gave up a salary of $40,000 per year plus 25% of the Aero's profits. He is suing Burris, the Denver Bears, and Gerald and Allan Phipps, general partners of the Denver Bears, for defamation and negligent and intentional infliction of severe emotional distress. He asks for $2,000,000 compensatory damages and $5,000,000 punitive damages.

## INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS

The parties have agreed and I find that Florida law applies. The Florida Supreme Court has yet to award damages for emotional or mental injuries standing alone. It has recognized, however, that a cause of action for negligent or intentional infliction of severe emotional distress may exist:

There may be circumstances under which one may recover for emotional or mental injuries, as where there has been a physical impact or when they are produced as a result of a deliberate and calculated act performed with the intention of producing such an injury by one knowing that such acts would probably— and most likely produce such an injury, but those are not the facts in this case.

*Gilliam v. Stewart,* 291 So.2d 593, 595 (Fla.1974). In *Gilliam,* a housewife sued the driver of a car involved in an accident in front of her house. The impact of the collision caused one car to hit a tree in her yard, and the other to hit her house. The impact of the car on the house knocked the plaintiff out of bed. She was then hospitalized for almost a month and treated for injuries including myocardial infarction and a cerebral embolus. *Stewart v. Gilliam,* 271 So.2d 466, 468 (Fla.App. 4th Dist.1973). The Florida Supreme Court held that since the car hit the plaintiff's house, rather than the plaintiff, the physical impact was only indirect. The plaintiff could not recover for her mental injuries, as she could prove neither direct physical impact nor a deliber-

---

**3.** "You can't sit on a lead and run a few plays into the line and just kill the clock. You've got to throw the ball over the goddamn plate and give the other man his chance. That's why baseball is the greatest game of all." Earl Weaver.

**4.** The pleadings and supporting affidavits clearly specify that the bottle was a Sprite bottle. They are unclear as to whether Burris' intended delivery was overhand, sidearm, or submarine style, or whether Burris was gripping the bottle

properly, label side up. Had Burris gripped the bottle properly, so that he could read the label, it would have been difficult for King to see it as well. The propriety of Burris' grip, however, does not affect the gravity of his threat. When Henry Aaron, one of the sport's most formidable hitters, was razzed for his improper grip, he replied, "I ain't up here to read—I'm up here to hit." Who can argue with 755 home runs and 3,771 career hits?

ate act performed with the intent of producing her injury.

King makes no allegation of direct physical impact, so I must dismiss his charge of negligent infliction of severe emotional distress. I turn now to the charge of intentional infliction of severe emotional distress. The Florida Supreme Court has not considered the charge since *Gilliam*. In an earlier case, *Slocum v. Food Fair Stores of Florida*, 100 So.2d 396 (Fla.1950), the court affirmed the dismissal of a complaint by a customer who sued a store after a clerk told her "If you want to know the price, you'll have to find out the best way you can ... you stink to me." *Id.* at 396–97.

Florida courts have been slow to allow recovery for emotional distress. The five Florida District Courts of Appeal are split on whether an independent tort of inten-

tional infliction of severe emotional distress exists.[5] The courts allow recovery only in extraordinary circumstances. They are generally stringent in their damage awards. In light of Florida's case law, I must decide whether defendant's conduct, reading all disputed facts against him, was extreme enough to state a claim beyond the defamation charges and any charges that plaintiff could bring for assault.

The First District adopted the language of the Restatement (Second) of Torts § 46 (1965)[6] and allowed recovery for the intentional infliction of severe emotional distress in *Ford Motor Credit Co. v. Sheehan*, 373 So.2d 956 (Fla.App. 1st Dist.1979). In *Sheehan*, a credit company employee was unable to find plaintiff, so he called plaintiff's mother and identified himself as an employee of a San Francisco hospital. The employee said that plaintiff's children had

5. The Second and Third Districts reject the intentional infliction of severe emotional distress as an independent tort. In *Gmuer v. Garner*, 426 So.2d 972 (Fla.App.2d Dist.1982), the Second District affirmed the trial court's order dismissing a complaint by an employee who, alleged that she lost her job because she declined sexual advances by her employer. The trial judge categorized the employer's "words and behavior as offensively suggestive and opprobrious, having a commonly understood meaning which was insulting to appellant, and as obnoxious and socially odious," *Id.* at 975, but found that they would not suffice to permit recovery for intentional infliction of severe emotional distress. The appellate court affirmed, denying the existence of an independent cause of action rather than weighing the severity of the comments.

In *Gellert v. Eastern Air Lines, Inc.*, 370 So.2d 802 (Fla.App.3d Dist.1979), *cert. denied*, 381 So.2d 766 (Fla.1979), an airline pilot sued Eastern for grounding him and publishing unfavorable medical reports about him after the pilot claimed that some of the airline's planes were unsafe. The Third District held that in order to recover, the pilot needed to allege both a separate tort and a flagrant wrong, and that he had alleged neither, so he had no remedy.

6. The pertinent language in Restatement (Second) of Torts § 46 (1965) is as follows:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liabil-

ity for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Comment d. *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

been involved in a serious automobile accident. After giving plaintiff's address and phone number to the credit agent, plaintiff's mother called the plaintiff, who spent seven hours calling various hospitals and police departments in a futile effort to find his children. The First District upheld a jury verdict awarding $4,000 actual damages and $11,000 punitive damages, writing that recovery is possible only where the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency," 373 So.2d at 960. The court added that "there is liability only for conduct exceeding all bounds which could be tolerated by society, of a nature especially calculated to cause mental damage of a very serious kind." *Id.*, quoting Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich.L.Rev. 874, 889 (1939).

The First District applied the same standard in *Dowling v. Blue Cross of Florida, Inc.*, 338 So.2d 88 (Fla.App. 1st Dist.1976), to dismiss a complaint by two women that their employer fired them, without investigation, based on a false accusation that they had sexual relations with one another in the ladies' lounge of the employer's building. The court held that even if all plaintiffs' charges were true, the employer's acts were not outrageous enough to predicate a suit for severe emotional distress.

The Fourth District also recognizes the tort of intentional infliction of severe emotional distress. In *Metropolitan Life Ins. Co. v. McCarson*, 429 So.2d 1287 (Fla.App. 4th Dist.1983), a court had ordered Metropolitan to reimburse a victim of Alzheimer's disease for her in-home nursing care. Metropolitan knew the victim had no other source of income, yet it continued to withhold the benefits. Without the benefits, the victim was forced to enter a nursing home, where her condition deteriorated rapidly and she died. The court found that the jury reasonably could have concluded that Metropolitan's actions were based on "bad blood" between the parties, and that "although fully aware of the serious condition of Mrs. McCarson and of its obligations to

her, [Metropolitan] discontinued the nursing services to 'spite' the McCarsons notwithstanding the potentially devastating consequences to her." *Id.* at 1291.

The Fifth District recognizes the tort, but has yet to find a case serious enough to allow a claim. In *Food Fair, Inc. v. Anderson*, 382 So.2d 150 (Fla.App. 5th Dist. 1980), the Fifth District dismissed a cashier's claim for intentional infliction of severe emotional distress against her employer. The employer, suffering from theft problems, hired a private investigator who interrogated the plaintiff and gave her a polygraph test. The investigator told the cashier that anyone who had been with the company for as long as she had must have stolen something, and that the company had a new policy requiring employees to confess to theft or be fired for lying. Protesting her innocence, but faced with the alternative of termination, the cashier confessed to stealing $150. The next day the investigator said that $150 wasn't enough, and that she would have to confess to stealing $500 to keep her job. She signed a confession, and was fired for theft. A jury awarded the cashier $40,000 compensatory and $360,000 punitive damages, and awarded her husband $7,500 for lost consortium. The Fifth District applied the test from *Ford Motor Credit Co. v. Sheehan*, 373 So.2d 396 (Fla.App.Dist. 1st 1979) and the Restatement (Second) of Torts § 46 comment d (1965), holding that the defendant's conduct was not sufficiently outrageous or intolerable, and that the trial court erred in not directing a verdict for the defendant.

The Fifth District applied the same test to dismiss a charge of intentional infliction of severe emotional distress in *Boyles v. Mid-Florida Television Corp.*, 431 So.2d 627 (Fla.App. 5th Dist.1983). In *Boyles* an assistant at a home for retarded children sued a television station for broadcasting a news report that falsely accused him of raping a mute child, linked him with the death of another child, and charged him with taunting the children during meals. The court dismissed the intentional infliction of severe emotional distress claim as

"merely an imperfect repetition" of plaintiff's libel suit. *Id.* at 636.

In this case, King's claim for severe emotional distress is a restatement of his defamation claims bolstered by the charge that Burris assaulted him with a Sprite bottle. Following Florida's application of Section 46 of the Restatement (Second) of Torts, I cannot find that King has alleged enough in his pleadings, depositions, and affidavits to maintain a cause of action for intentional infliction of severe emotional distress. In light of the charges dismissed in *Dowling, Boyles*, and *Food Fair*, I find that Burris' behavior, however unsavory even in sporting circles, was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Food Fair*, 382 So.2d at 153, quoting Restatement (Second) of Torts § 46 comment d (1965).

## DEFAMATION

The parties have stipulated that Burris called King a "damn fat fag,"[7] "fatso," and "liar," and said "I ought to hit you in the mouth" and "Why don't you do the game of baseball a favor and resign," but dispute any further comments that may have been made.[8] Burris' comments, while hardly reminiscent of Cyrano de Bergerac's nose speech among baseball's contributions to the ancient art of insult,[9] do state a cause of action for defamation. The pleadings raise many interesting issues such as whether the term "fag" constitutes defamation *per se* or *per quod*,[10] whether King

---

7. King is particularly upset with the use of the word "fag":

"[T]o me this is the lowest blow that was ever struck at me, to have ugly words like that come out of a man's mouth. I know we're in a different world today, but I have nothing but detest for homosexuals, just—the mere mention, if I shook hands with a homosexual, then somebody told me that, I'd go out and wash my hands right away. So if a guy were to talk baseball language and we were in a room and there wasn't any women and it was strictly American Association directors, and he'd have said to me, "You dirty CS," now, that's baseball language, but when you refine it to faggot and fag and repeat it and repeat it and you go berzerk, so to speak, pick up a sprite [sic] bottle and go wild, had to be restrained by a couple of people, I don't—I don't see this is—it's easy for a man to take." Deposition of Dick King at 92. It was Jacques Barzun who said, "Whoever wants to know the heart and mind of America had better learn baseball."

8. Their disputes range from the serious, such as whether Burris actually threatened King with a bottle, to the petty, such as Burris' word choice. Burris claims: "I don't think I specifically said fat head, faggot. I had never used the word faggot in my life. When I saw these Minutes, I even looked it up. I think I did say you fat fag or fat boy or, I'll hit you in the mouth, but the word faggot I never used." Deposition of Jim Burris at 31.

9. *See, e.g.,* "There is no reason why the field should not try to put the batsman off his stroke at the critical moment by neatly timed disparagements of his wife's fidelity and his mother's respectability." George Bernard Shaw.

"[H]is head was full of larceny, but his feet were honest." "Bugs" Bear on outfielder Ping Bodie, 1917.

"Call me anything, call me M_____ F_____ but don't call me Durocher. A Durocher is the lowest form of living matter." Harry Wendelstedt, 1974.

"The more we lose, the more Steinbrenner will fly in. And the more he flies, the better chance there will be a plane crash." Graig Nettles, 1977.

"(Charley Finley) would want to know why there were fourteen uniforms dirty when only ten men got in the game." Frank Ciensczk, Oakland equipment manager, 1972.

"I have often called Bowie Kuhn a village idiot. I apologize to all the village idiots of America. He is the nation's idiot." Charlie Finley, 1981.

"The best way to test a Timex would be to strap it to [Earl] Weaver's tongue." Marty Springstead, umpire.

"As a lifetime Cubs fan, I was used to players who, as the sportswriters say, 'can do it all.' In the case of the Cubs, 'doing it all' means striking out, running the wrong way, falling down, dropping the ball." Mike Royko, writer.

10. The words "fag" and "faggot" have many uses in the English language. "Fag" can mean a tuft of grass, a cigarette, or toil. A faggot can be a bundle of sticks, or a spicy meatball. *Webster's New International Dictionary*, 2d Ed., 1950. Nonetheless, one use of both terms predominates in American culture, and this court will follow that interpretation.

[T]he sole occasion upon which the word "fag" is commonly used in the United States, in the form of a noun and to connote an adult

**1158**

is a public figure, and whether the Denver Bears or its General Partners ratified Burris' statements.

I need not, however, decide any of these issues because King never notified Burris of his intent to sue. Fla.Stat.Ann. § 770.01 reads:

> Before any civil action is brought for publication in a newspaper, periodical, or other medium, of a libel or a slander, the plaintiff shall, at least five days before instituting such an action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he alleges to be false or defamatory.

King argues that I should apply the maxim *"ejusdem generis"* to limit the meaning of "other medium" to forms of mass communication. I believe it prudent, however, to follow the interpretation of a recognized expert in Florida law. In 1976, the legislature amended the statute, adding both "other medium" and "slander" to the wording. In view of the added language, a United States District Judge sitting in Florida wrote that "[t]he better interpretation of the statute's applicability ... is that the provision is applicable to all defendants in actions for libel or slander." *Laney v. Knight-Ridder Newspapers, Inc.,* 532 F.Supp. 910, 913 (S.D.Fla.1982). *Laney* dismissed without prejudice a defamation action against a local newspaper after plaintiff failed to give notice. Following *Laney,* I will dismiss King's defamation charge without prejudice.[11]

Accordingly, the defamation claims are dismissed without prejudice; summary judgment is granted for the defendants and against the plaintiff on the negligent and intentional infliction of emotional distress claims. Each party shall bear his or its own costs. This civil action is dismissed.

human being, is with reference to a homosexual. To suggest otherwise serves only to further test the gullibility of the credulous and require this court to espouse a naivete unwarranted under the circumstances.
*Moricoli v. Schwartz,* 46 Ill.App.3d 481, ——, 5 Ill.Dec. 74, 361 N.E.2d 74, 76 (Ill.App.1977).

11. "Without prejudice" is a technical legal term which means about the same as Yogi Berra meant when he said, "The games not over until it's over."