In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-3424

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FREDERICK R. JAMES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-30086-MJR—**Michael J. Reagan**, *Judge.*

ARGUED APRIL 4, 2003—DECIDED MAY 14, 2003

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Indicted for selling marijuana and possessing a gun in connection with that crime, Frederick James offered the "defense" that his ancestors came from Africa, that he is therefore a Moorish national, and that as a result he need obey only those laws mentioned in an ancient treaty between the United States and Morocco. This view of legal obligations is espoused by many adherents to the Moorish Science Temple, which was founded in 1913 by prophet Noble Drew Ali. Moorish Science is a heterodox Islamic sect based on teachings of Drew and his "Seven Circle Koran." It is a tenet of Moorish Science that any adherent may adopt any title,

and issue any documents, he pleases. Drew told his followers that they are not U.S. citizens and distributed "Moorish Passports." Some members of this sect hand out what they call "security agreements" that purport to oblige strangers to pay hefty sums for using the members' names, which they deem copyrighted under their private legal system. James is among those who claim a right to compensation for every mention of his name. James demanded that the prosecutor, witnesses, and judge enter into compensation contracts before James would acknowledge the court's authority.

Needless to say, the combination of a wacky "defense" with the demand for payment every time James's name was spoken diverted attention from the criminal charges (which may have been his object). Laws of the United States apply to all persons within its borders. Even if James were not a citizen of the United States (though he is, having been born here), he would be obliged to respect the laws of this nation. Disdaining to obey federal law, James also refused to cooperate with his appointed lawyer, who would neither support his proposed defense nor enter into a compensation contract for the use of his name. Observing that James also contended that his arrest was a war crime and that the indictment was invalid (the grand jurors had not contracted for the right to use James's name, let alone put it in capital letters), appointed counsel asked the judge to refer James for a mental examination to determine whether he was able to understand the proceedings and assist in his defense. True to form, James refused to take a position on this issue (though he did deny ever being under care for mental problems). Instead of addressing the question at hand, James proclaimed:

> I am the secured party in this matter and the name you have just called or used in this courtroom is my property. You do not have my permission to use my

> private property in this courtroom. I can be addressed as secured party. You do not have my authorization for using my copyrighted name in this courtroom without compensating me. Further use of any of my personal property executes the contract and the security agreement that you received in the mail. The terms of the contract reflect what I am saying here. I am here to do business. If you want to do business, let's do business, or let's call it off and go home.

James was not allowed to go home but was referred for a mental exam. Predictably, he refused to cooperate. A clinical psychologist reported (after interviewing James's sister and his Moorish counselor) that he had no reason to think James unfit for trial. No other evidence was available, so the court accepted this assessment. Declared mentally fit, James dismissed his attorney, see *Godinez v. Moran*, 509 U.S. 389 (1993) (any defendant competent to stand trial also is competent to represent himself), and proceeded to illustrate the maxim that anyone who acts as his own lawyer has a fool for a client. James was convicted as charged and sentenced to 270 months' imprisonment.

Defendants' right of self representation does not extend to appeal. See *Martinez v. Court of Appeal*, 528 U.S. 152 (2000). In this court, therefore, James is represented by counsel, whose principal contention is that the district judge should not have allowed the trial to occur. James's professed beliefs, according to counsel, show that he is delusional (or at least that he hadn't a clue what the criminal prosecution was about), and the psychologist's report did not provide any contrary evidence. Instead, counsel contends, the judge essentially deferred to James's view of his own mental prowess; yet one sign of mental incompetence may be an unjustified belief in one's abilities. If the only way a defendant can be deemed incompe-

tent to stand trial is to be mentally acute enough to prove it, then he must be competent after all. That's Yossarian's conundrum in *Catch-22*. (Only incompetent aviators could be removed from flight duty, but this required an application—and anyone who *wanted* to stay on the ground must be sane.) The point is sound; the district judge should not have required James to shoulder any burden and should not have given weight to a psychological report resting on a view that defendants are presumed competent until they prove otherwise. See *United States v. Billingsley*, 766 F.2d 1015, 1023-24 (7th Cir. 1985). It does not follow, however, that the district judge must try to gather more evidence. Indeed, we do not think that the judge should have referred James for an exam in the first place.

The only reason adduced, in the district court or this one, for thinking James incompetent to stand trial is the unusual nature of his beliefs. His behavior (both in the marijuana trade and in court) is that of a person able to understand his surroundings. Many litigants articulate beliefs that have no legal support—think of tax protesters who insist that wages are not income, that taxes are voluntary, or that only foreigners must pay taxes; or think of homeowners who contend that because their property can be traced to a land grant signed by President Fillmore their mortgages can't be foreclosed. Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect (see *Young v. Walls*, 311 F.3d 846 (7th Cir. 2002)) so deficient that trial is impossible. Airline pilots, see *Cheek v. United States*, 498 U.S. 192 (1991), dentists, see *United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991), and other persons of unquestioned competence have espoused ludicrous legal positions. No one suggested that Captain Cheek or Dr. Dunkel required a mental exam; if their weird legal views

did not imply incompetence to be tried, why should James's? It is not as if James inhabited a private mental world. His beliefs are held by other adherents to the Moorish Science Temple. See, e.g., *United States v. Frazier-El*, 204 F.3d 553 (4th Cir. 2000). Consider this exchange between the judge and one of the spectators in the gallery:

> UNIDENTIFIED SPEAKER 2: I am a secure party in this matter—
>
> THE COURT: Sir, I will address you when the time comes. Are you a lawyer?
>
> UNIDENTIFIED SPEAKER 2: I am not a lawyer or esquire. I am a secured party.
>
> THE COURT: Sit down, please, sir.
>
> UNIDENTIFIED SPEAKER 2: I am a secure party. . .
>
> THE COURT: Remove him from the courtroom, please.
>
> UNIDENTIFIED SPEAKER 2: My private property—named in this matter for the unjust enrichment of the people without my consent. Are we in contract? Will you please take your hands from me?
>
> THE COURT: Sir, you are welcome back when you listen to the Court's orders.
>
> UNIDENTIFIED SPEAKER 2: Is my private property name without my consent. . .

Although the court reporter may not have captured this exchange precisely, the spectator obviously shares James's view that he is entitled to prevent the judge from speaking his name, unless the judge contracts for compensation. One person with a fantastic view may be

suspected of delusions; two people with the identical view are just oddballs. That James was obstreperous likewise does not cast doubt on his mental acumen; many a person with no defense would rather play games, and try to goad the judge into error, than face the music politely. We do not doubt James's ability to understand the proceedings and thus have no reason to instruct the judge to hold another hearing about his competence.

Before trial James used his mailing privileges as a federal prisoner to send the judge, the prosecutor, personnel in the clerk's office, and several potential witnesses, copies of the "contract and security agreement" requiring them to pay $500,000 for each use of his name. James mailed the judge a bill for $151 million. He also had a box delivered to the judge's home. This caused concern about the judge's security. Did it contain a bomb or some other dangerous agent? The Marshal Service found that it contained only more of James's pestiferous contracts, but in a drug-and-gun prosecution the box's contents were not the only worry: was James sending the message "I know where your children live"? The judge inferred from these documents, which included references to Article 9 of the Uniform Commercial Code, that James planned to file copies as liens against property owned by recipients. Although such documents would have no legal effect, it could require the recipients to pay counsel for work necessary to clear their titles before selling any of this property. The district judge directed James in open court to cease mailing these documents; he refused to comply, and in sentencing the judge concluded that James had obstructed justice. This added two offense levels under the Sentencing Guidelines. Appellate counsel contends that the addition was improper because the recipients, all of whom are regular participants in the criminal justice system, could not have been intimidated. That's not so clear; the judge reported that members of his staff had begged off from the case:

> There are individuals in this courthouse who come to work and try to do a good job every single day and by you filing these documents I had clerks in my own chambers who asked to be relieved of any duties with respect to your case because they were either trying to get student loans or they were trying to refinance their houses. They were concerned if their name appeared on any document with respect to your case you would send them one of these frivolous bills and that would preclude them from getting financing. Because of that, my own chambers had changes made within it whereby I did much of the clerk's work so that no one else had to deal with you or your name or have any liens impressed upon their property. . . . If these documents would be filed, they could tie up someone's personal property as well as someone's real estate. So I find that you filed these for purposes of intimidation and harassment . . . .

What is more, the enhancement is authorized not only for successful obstruction but also for any attempt to obstruct or impede the administration of justice. U.S.S.G. §3C1.1. A defendant who commits perjury at trial does not evade the enhancement just because the jurors see through the façade. Likewise with unsuccessful attempts to intimidate. James should thank his lucky stars that he was not held in contempt of court for disobeying the judge's order to desist.

Although James's conviction and sentence are free of error, one additional matter requires comment. Several spectators came to court wearing hats. The judge directed them to uncover their heads:

> THE COURT: I note there are quite a few people here. As a matter of respect for the Court, the dignity of the Court does not allow any head-

> dresses, so individuals wearing any type of head-dresses will be asked to leave now or remove them. Also, no hats, no skull caps, nothing like that is permitted. Did you folks hear me in the back?
>
> UNIDENTIFIED SPEAKER: This is my national headdress and also a part of my religion.
>
> THE COURT: Ma'am, that is not allowed in this courtroom. You are welcome without it, so please leave until you can take it off.
>
> UNIDENTIFIED SPEAKER: If Jews were to come in here—
>
> THE COURT: Jews will not wear yarmulkes. I am Catholic and the Pope would not wear a miter. Please leave, take it off and come back in, or do not come back in, the choice is yours.

Counsel for James contends that the district judge violated the first amendment by excluding from the courtroom any spectators whose religious beliefs require them to cover their heads. Because James himself did not seek to wear any form of head covering, he lacks standing to raise this contention. None of the spectators was held in contempt, and none has sued seeking a declaratory judgment. But although this appeal does not present an Article III case or controversy on this issue, the judicial branch has an interest in the prudent handling of public relations, and no formal controversy is needed to say a few words on the topic.

The Constitution does not oblige the government to accommodate religiously motivated conduct that is forbidden by neutral rules, see *Employment Division v. Smith*, 494 U.S. 872 (1990), and therefore does not entitle anyone to wear religious headgear in places where rules of general application require all heads to be bare or to be

covered in uniform ways (for example, by military caps or helmets). See *Goldman v. Weinberger*, 475 U.S. 503 (1986). Yet the judicial branch is free to extend spectators more than their constitutional minimum entitlement.

Tolerance usually is the best course in a pluralistic nation. Accommodation of religiously inspired conduct is a token of respect for, and a beacon of welcome to, those whose beliefs differ from the majority's. The best way for the judiciary to receive the public's respect is to earn that respect by showing a wise appreciation of cultural and religious diversity. Obeisance differs from respect; to demand the former in the name of the latter is self-defeating. It is difficult for us to see any reason why a Jew may not wear his yarmulke in court, a Sikh his turban, a Muslim woman her chador, or a Moor his fez. Most spectators will continue to doff their caps as a sign of respect for the judiciary; those who keep heads covered as a sign of respect for (or obedience to) a power higher than the state should not be cast out of court or threatened with penalties. Defendants are entitled to trials that others of their faith may freely attend, and spectators of all faiths are entitled to see justice being done.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*