[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15035

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RAUL S. RAMIREZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 28, 2012)

Before TJOFLAT, PRYOR and RIPPLE,* Circuit Judges.

PER CURIAM:

Raul Ramirez appeals his convictions and sentences for one count of

conspiracy to commit health care fraud, 18 U.S.C. § 1349; twelve counts of health

_____

*Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting
by designation.

care fraud, id. § 1347; and three counts of money laundering, id. § 1957.  Ramirez argues that the district court erred when it refused to dismiss his indictment, failed to conduct competency hearings sua sponte, and made several evidentiary rulings at trial.  Ramirez also argues that the district court erred when it sentenced him.  All of Ramirez's arguments lack merit.  We affirm.

## I.  BACKGROUND

Ramirez owned R.A. Medical Center, a medical clinic in Miami, Florida, and served as its executive director.  From February 2004 to April 2005, R.A. Medical paid Medicare beneficiaries to visit the clinic and billed Medicare for infusion and injection treatments for HIV.  Dr. Joseph Barata worked at R.A. Medical and his Medicare provider number was used to submit claims to Medicare.

In 2005, the government filed a civil forfeiture action against Ramirez and alleged that he had billed Medicare for medically unnecessary and unperformed procedures.  In February 2006, while the civil forfeiture case was pending, Ramirez was injured in a car accident.  According to Ramirez, he sustained six herniated disks, four of which protruded into his spinal cord; an injury to his head; pain, numbness, tremors, and headaches; and a loss of physical strength and mental acumen.  Ramirez settled the civil case with the government.

Ramirez was indicted on April 2, 2009, and the charges at issue in this appeal involve the same conduct that was at issue in the civil forfeiture proceeding. Before trial, Ramirez filed a letter labeled "Secured Party Creditor" with the district court in which he moved the court to dismiss the indictment. The district court held a hearing on the motion, during which Ramirez stated that he was "a secured party creator [sic] and sovereign." He also stated that, because he was an independent sovereign, the district court lacked jurisdiction over him, and he moved the district court to dismiss the indictment. The district court denied the motion and ordered a magistrate judge to hold a competency hearing. The magistrate judge ruled that Ramirez was competent to stand trial.

At trial, the government produced evidence that Ramirez had manipulated blood samples of his patients as part of a scheme and artifice to defraud Medicare. R.A. Medical sent blood samples of its patients to Mercy Laboratory for testing. Two lab technicians who tested blood samples from R.A. Medical at Mercy Laboratory, Marisol Prendes and James Vaden, testified that, in their opinion, R.A. Medical manipulated some of the blood samples in a centrifuge. The government argued that R.A. Medical manipulated the blood because it wanted the blood tests of the patients to show a decreased blood platelet count so that R.A. Medical could justify billing Medicare for expensive medications.

Dr. Michael Wohlfeiler, a Miami physician who specializes in the treatment

of HIV/AIDS, corroborated this theory with expert testimony.  Dr. Wohlfeiler examined the medical records of patients who received treatment from both a primary care physician and R.A. Medical.  He testified that the results of blood tests conducted at R.A. Medical were inconsistent with the results of blood tests conducted at other locations.  For example, a sample from a patient collected at Cedar Springs Medical established that the patient had a platelet count of 198,000, a normal level, but seven days later, the results from a sample collected by R.A. Medical from the same patient showed that the platelet count was 47,000. Dr. Wohlfeiler explained that there was no legitimate medical explanation for those types of drops in platelet levels within ten days.  He also explained that a critical value platelet count is rare for HIV patients.  In addition to testifying about discrepancies in the blood samples, Dr. Wohlfeiler testified that many of the treatments provided to patients at R.A. Medical did not make medical sense.  The jury convicted Ramirez of each charge in the indictment.

At the sentencing hearing, Ramirez called Dr. Jorge Betancourt, a psychiatrist who began treating Ramirez in November 2007.  Dr. Bentancourt testified that Ramirez had been referred to him due to the concerns of another physician about Ramirez's cognitive deterioration.  Dr. Betancourt saw Ramirez six times and diagnosed him with post-traumatic stress disorder.

The district court applied a two-level enhancement because the offense

involved the conscious or reckless risk of death or serious bodily injury.  Dr. Wohlfeiler testified that patients treated at R.A. Medical were put at great risk by the practices of the clinic.  Dr. Wohlfeiler also testified that files of R.A. Medical that he reviewed did not establish that patients at R.A. Medical received appropriate monitoring and treatment.

The district court also applied a two-level obstruction of justice enhancement.  In applying the enhancement, the district court relied on testimony that Ramirez gave during a September 12, 2006, deposition in the related forfeiture case.  During the deposition, Ramirez testified that Dr. Barata treated a patient on May 25, 2004, but the testimony at trial established that Dr. Barata was in Spain on that date.  At the sentencing, Ramirez argued that he had not intentionally lied under oath because he had physical and mental difficulties during the deposition as a result of his car accident.  But the district court found that Ramirez had lied under oath during his deposition.

After applying the two enhancements, Ramirez's total adjusted offense level was 36 with a criminal history category I, and Ramirez's advisory guideline range was 188 to 235 months of imprisonment.  The district court sentenced Ramirez to 120 months of imprisonment for the conspiracy to commit health care fraud and the substantive health care fraud counts and a consecutive term of 90 months for

5

the money laundering counts.

## II.  STANDARDS OF REVIEW

Several standards of review govern this appeal.  We review the denial of a motion to dismiss an indictment for an abuse of discretion.  United States v. Clarke, 312 F.3d 1343, 1345 n.1 (11th Cir. 2002).  We review the finding that a defendant is competent to stand trial for clear error.  United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir. 2006).  We review for abuse of discretion the failure of a district court to conduct a competency hearing sua sponte. United States v. Williams, 468 F.2d 819, 820 (5th Cir. 1972).  We review evidentiary rulings for abuse of discretion.  United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).  If an error was not preserved, we review for plain error.  United States v. Langford, 647 F.3d 1309, 1325 n.11 (11th Cir. 2011).  We review for clear error the factual findings underlying a sentencing enhancement, and we accord great deference to the credibility determinations of the district court.  United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002).  We review the application of law to those facts de novo.  Id.  We review the reasonableness of a sentence for abuse of discretion.  United States v. Livesay, 587 F.3d 1274, 1278 (11th Cir. 2009).

## III.  DISCUSSION

6

We divide our discussion into four parts.  First, we address whether the district court abused its discretion when it refused to dismiss the indictment.  Second, we address whether the district court abused its discretion when it did not conduct a competency hearing sua sponte.  Third, we address whether the evidentiary rulings of the district court require reversal.  Fourth, we address whether the district court erred when it sentenced Ramirez.

## A.  The District Court Did Not Abuse Its Discretion When It Refused to Dismiss the Indictment.

Ramirez argues that his due process rights were violated when the government delayed bringing an indictment against him for four years.  The government responds that any delay in bringing the indictment was reasonable due to the complex nature of Medicare fraud prosecutions.  Ramirez's argument fails.

The statute of limitations is the primary safeguard against the government bringing stale criminal charges, United States v. Marion, 404 U.S. 307, 322, 92 S. Ct. 455, 464 (1971), but when a defendant establishes substantial prejudice, due process may require the dismissal of an otherwise timely indictment if the delay was the product of a deliberate act by the government to gain a tactical advantage, United States v. Foxman, 87 F.3d 1220, 1222 (11th Cir. 1996).  Because Ramirez does not argue that the applicable statutes of limitations barred his prosecution, he

7

shoulders the burden of "show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage." United States v. Thomas, 62 F.3d 1332, 1339 (11th Cir. 1995). To meet this burden, Ramirez must establish either that the government acted in "bad faith" by intentionally delaying the prosecution to cause Ramirez prejudice or that "the government ma[de] a judgment about how it [could] best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, [the] indictment [was] delayed." Foxman, 87 F.3d at 1223 n.2.

Even if we assume that Ramirez suffered substantial prejudice from the failure of the government to indict him earlier, Ramirez failed to establish that the delay was the product of bad faith or a deliberate design by the government to gain a tactical advantage. In his opening brief, Ramirez makes the conclusory assertion that "[t]he government deliberately delayed the indictment for four years, even though it was aware of substantially the same witnesses and documents which were available in 2005 and 2009," but he fails to identify facts that would tend to prove that the government acted in bad faith or made a deliberate decision to gain a tactical advantage over him that led to the delay. In his reply brief, Ramirez argues that the representation of the government that the delay was due to the complexity of the case "does not truly explain the delay," but the government does

8

not bear the burden of explaining the reason for the delay. As the district court explained, Ramirez's "claim of any Government intent to obtain a tactical advantage is speculation." The district court did not abuse its discretion when it refused to dismiss the indictment for preindictment delay.

### B.  Ramirez Was Competent to Stand Trial.

Ramirez argues that the magistrate judge erred when he found that Ramirez was competent to stand trial, but Ramirez does not dispute that he failed to object to this pretrial ruling as required by Federal Rule of Criminal Procedure 59(a). Accordingly, we lack jurisdiction to address this argument. See United States v. Schultz, 565 F.3d 1353, 1359–62 (11th Cir. 2009).

Ramirez argues too that the district court should have conducted an inquiry into his competency sua sponte both during trial and before sentencing. A defendant has a due process right not to be tried or convicted while incompetent. Drope v. Missouri, 420 U.S. 162, 171–72, 95 S. Ct. 896, 903–04 (1975). For a defendant to be competent to stand trial, he must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] ha[ve] a rational as well as factual understanding of the proceedings against him." United States v. Rahim, 431 F.3d 753, 759 (11th Cir. 2005) (alterations in original) (quoting Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995)).

9

The district court must conduct a hearing sua sponte to determine whether a defendant is competent "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

A district court must conduct a competency hearing sua sponte when the information known to the district court is "sufficient to raise a bona fide doubt regarding the defendant's competence." Tiller v. Esposito, 911 F.2d 575, 576 (11th Cir. 1990). We consider three factors in deciding whether the district court violated the due process rights of the defendant by failing to hold a competency hearing sua sponte: "(1) evidence of the defendant's irrational behavior; (2) the defendant's demeanor at trial; and (3) prior medical opinion regarding the defendant's competence to stand trial." Id. It is clear from the record that the district court did not abuse its discretion by failing to conduct a competency hearing sua sponte.

Ramirez argues that his statements to the the district court that he was an "independent sovereignty" free from the jurisdiction of the federal courts and that as a "secured party creditor" he was protected from prosecution is evidence of

10

irrational behavior and incompetence, but at least two of our sister circuits have rejected similar arguments.  See, e.g., United States v. Brown, 669 F.3d 10, 18–19 (1st Cir. 2012); United States v. James, 328 F.3d 953, 955 (7th Cir. 2003).  As Judge Easterbrook explained in James, the assertion of a ludicrous legal argument by a defendant does not evince mental incompetence sufficient to preclude the government from prosecuting the defendant:

> Many litigants articulate beliefs that have no legal support—think of tax protesters who insist that wages are not income, that taxes are voluntary, or that only foreigners must pay taxes; or think of homeowners who contend that because their property can be traced to a land grant signed by President Fillmore their mortgages can't be foreclosed.  Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect so deficient that trial is impossible.

328 F.3d at 955 (citation omitted).  Ramirez's desire not to be prosecuted by the United States does not establish his incompetence.

Ramirez also argues that his demeanor during the court proceedings suggests that he was incompetent to stand trial, but this argument lacks merit. Before the defense presented its case, the district court placed Ramirez under oath and asked him whether he understood his right to testify on his own behalf or not to do so.  The district court questioned Ramirez about his interactions with his lawyer.  Ramirez responded to each of these inquiries with rational answers, and

11

he informed the district court both that he understood the rights he was waiving and that he knew that he would not be able to complain about his decision to do so if he were convicted. And Ramirez did not hesitate to bring to the attention of the district court issues that were important to him. Ramirez advised the district court that he allegedly had not received the kosher meals that he requested. He also notified the district court that he did not believe that he was being treated well by the United States marshals while in their custody. In the light of Ramirez's rational responses to the questions of the district court and his ability and willingness to bring to the attention of the district court several personal issues, we cannot conclude that Ramirez's demeanor during the court proceedings gave the district court any reason to think that Ramirez was not competent to stand trial.

Expert testimony established that Ramirez was competent to stand trial and that he was likely malingering to make himself look mentally unstable. Dr. Miller testified during the competency hearing that, when she evaluated Ramirez, he was able to engage in complex conversation with clear and coherent thinking. Dr. Miller testified that Ramirez scored in the competent range on the Georgia Court Competency Test. Dr. Miller also testified that the testing results and her observations established that Ramirez was malingering. Although Ramirez presented the testimony of an attorney who had represented him in an earlier civil

12

proceeding that Ramirez had memory problems and was unable to organize his thoughts, the testimony of a lawyer is not medical opinion.  The magistrate judge acknowledged the testimony of Ramirez's civil lawyer, but credited Dr. Miller's testimony.

Ramirez also argues that the district court erred when it did not inquire sua sponte into whether he was physically competent to stand trial.  Ramirez argues that his need to "be excused from trial [for one day] to attend a preoperative surgical consult" about his colon cancer and the fact that he had surgery two weeks after he was convicted "should have given the court pause as to whether Ramirez was able to effectively assist counsel during trial."  We have explained that "a defendant who is 'mentally competent' within the meaning of 18 U.S.C. § 4244 et seq. may yet be 'physically incompetent'–unable, by virtue (for example) of a painful physical condition or the temporary effects of narcotics, to participate effectively in his own defense," United States v. Schaffer, 433 F.2d 928, 930 (5th Cir. 1970), but as the district court observed, at "no time did [Ramirez] mention that his cancer diagnosis was an issue in either the continued progress of the trial or his ability to take the stand."  There is no evidence that Ramirez's physical condition impaired his ability to consult with his attorney or to understand the charges against him.  The district court did not abuse its discretion by not

13

conducting a hearing sua sponte into whether Ramirez was physically competent to stand trial.

   C. *The Evidentiary Rulings of the District Court Do Not Require Us to Reverse Ramirez's Convictions.*

We divide our discussion of Ramirez's arguments about evidentiary rulings into four parts. First, we address Ramirez's argument that the district court abused its discretion when it admitted evidence of lab reports over Ramirez's objection. Second, we address Ramirez's argument that the district court improperly admitted the expert testimony of four witnesses. Third, we address Ramirez's argument that the district court abused its discretion when it admitted summary charts of evidence. Fourth, we address Ramirez's argument that we should apply the cumulative error doctrine.

1. The District Court Did Not Abuse Its Discretion When It Admitted Evidence of the Lab Reports.

Ramirez argues that the district court abused its discretion when it admitted lab results from Mercy Laboratory because there was "a total breakdown in the chain of custody" relative to the vials of blood underlying the lab results. The government argues that the district court did not abuse its discretion because chain of custody objections go to the weight rather than the admissibility of evidence. We agree with the government.

14

Ramirez's argument that the lab reports were not authenticated because there were gaps in the chain of custody fails.  Federal Rule of Evidence 901 provides that evidence is properly authenticated when there is "evidence sufficient to support a finding that the item in question is what the proponent claims it is." Fed. R. Evid. 901(a).  After a party has presented sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be, the evidence should be admitted and the trier of fact is permitted to determine whether the proffered evidence is what it purports to be.  United States v. Caldwell, 776 F.2d 989, 1001–02 (11th Cir. 1985).  "[G]aps in the chain of custody affect only the weight of the evidence and not its admissibility." United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990).  The district court did not abuse its discretion when it admitted evidence of the lab reports over Ramirez's objection that there were problems with the chain of custody.

2. Although the District Court Erroneously Admitted Expert Opinion Evidence, the Error Was Harmless.

Ramirez makes four arguments about the admission of expert testimony against him.  First, Ramirez argues that the district court erred when it allowed Prendes to offer expert opinion about the manipulation of blood samples by R.A. Medical.  Second, Ramirez argues that the district court erred when it allowed

15

Vaden to offer expert opinion about the blood samples.  Third, Ramirez argues that the district court erred when it allowed Vicki Nelson, a registered nurse, to offer medical opinion about the treatment of patients by R.A. Medical. Fourth, Ramirez argues that the district court erred when it allowed Ellen Lapp, an agent with the Federal Bureau of Investigation, to offer medical opinion about the treatment of patients by R.A. Medical.

a.  Prendes's Testimony Was Inadmissible as Lay Opinion, but the Admission of This Testimony Was Harmless Error.

Ramirez argues that Prendes's testimony about the lab reports was improper lay opinion testimony because it was not rationally based upon her perception; it was not helpful; and it was based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  The government responds that Prendes's testimony was admissible lay opinion testimony because "Prendes . . . drew upon past experiences to explain the different results and help the jury understand them."

Prendes's opinion that Ramirez manipulated blood in a centrifuge was inadmissible as lay opinion testimony.  Federal Rule of Evidence 701 provides that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are

16

(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Prendes testified that the blood results from the lavender and yellow-topped vials showed significantly different values for blood from the same person. Prendes then testified that, in her opinion, this type of manipulation could be carried out by putting blood into a centrifuge. Prendes testified that, in her opinion, the lavender-topped vials had been spun inside the centrifuge to cause the red blood cells to fall to the bottom. The explanation of a medical lab technician that the white blood cell count of blood can be manipulated by separating the blood into different layers in a centrifuge constitutes "scientific, technical, or other specialized knowledge." Id. 701(c). The district court abused its discretion by admitting this evidence under an incorrect legal standard.

The government argues that the admission of Prendes's testimony was a harmless error because there was "other evidence that the blood was manipulated," and we agree. As the government argues, Dr. Wohlfeiler, "testified at length about the different blood results when he compared blood tests from other hospitals and laboratories with the [R.A. Medical] results and concluded the [R.A. Medical]

17

results were not 'legitimate' and had to have been 'tampered with to give a certain result.'"  Dr. Wohlfelier was a highly creditentialed expert who had published numerous works about HIV, including an article in the New England Journal of Medicine, and he provided overwhelming evidence that Ramirez had "manipulate[d]  blood samples of Medicare beneficiaries before sending them for laboratory testing" as part of his scheme and artifice to defraud Medicare.

 b.  <u>Vaden's Testimony Was Inadmissible as Lay Opinion Testimony, but Ramirez Fails to Meet His Burden Under Plain Error Review.</u>

Ramirez argues that Vaden's testimony about the lab reports was improper lay opinion testimony because it was not rationally based upon his perception; it was not helpful; and it was based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  The government responds that Vaden's testimony was admissible lay opinion testimony because "Vaden drew upon past experiences to explain the different results and help the jury understand them."  Because Ramirez did not object to Vaden's testimony, we review for plain error.

No plain error occurred.  Like Prendes, Vaden testified that the lavender and yellow-topped tubes contained different platelet values and that, in his opinion, this difference could have resulted from the lavender-topped vials being placed into a centrifuge.  Vaden's testimony constituted expert opinion, and the district

18

court abused its discretion by admitting it under Rule 701.  But Ramirez offers no argument that the error affected his substantial rights.

c. Nelson's Testimony Was Inadmissible as Lay Opinion Testimony, but the Admission of This Testimony Was Harmless.

Ramirez argues that the district court erred when it allowed Vicki Nelson, a registered nurse, to offer "medical opinion about the treatment [that R.A. Medical] provided to its patients."  Ramirez argues that, "[b]ecause Nelson [was a] fact witness[], and because [she] gave medical opinions beyond any demonstrated area of expertise, [Nelson's] testimony was improper."

The district court erred when it admitted Nelson's testimony, but the admission of Nelson's medical opinion about Ramirez's treatment of patients at R.A. Medical was harmless.  As the government argues, "Dr. Wohlfeiler . . . testified that the dosage of certain medications should be changed as a patient's weight changed which was not done at" R.A. Medical.  "Dr. Wohlfeiler. . . testified that [HIV medication] was given without medical justification."  In the light of Dr. Wohlfeiler's testimony, the admission of Nelson's medical testimony was harmless.

d. The District Court Did Not Err When It Admitted Agent Lapp's Testimony.

Ramirez argues that the district court erred when it allowed Ellen Lapp, an

19

FBI agent, to offer "medical opinion about the treatment [that R.A. Medical] provided to its patients." The government responds that Agent Lapp did not offer expert opinion testimony. Ramirez did not object to Agent Lapp's testimony on the ground that she offered impermissible expert testimony, so we review for plain error. Langford, 647 F.3d at 1326 n.11.

No plain error occurred. In his brief, Ramirez does not identify any portion of Agent Lapp's testimony in which Agent Lapp offered opinion testimony. Ramirez cites to the first two pages of Agent Lapp's testimony, in which Agent Lapp described her background in law enforcement and her participation in the investigation of R.A. Medical. When asked at oral argument to identify Lapp's expert testimony, Ramirez's lawyer stated that the "extent" of this testimony was a single statement by Lapp that "the Mercy lab reports had discrepancies."

### 3. The District Court Did Not Abuse Its Discretion When It Admitted Summary Evidence.

Ramirez argues that the "government . . . violated [his] rights when it admitted several inflammatory charts and another summary exhibit into evidence, rather than limiting these items to demonstrative evidence," but we disagree. Federal Rule of Evidence 1006 permits parties to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury. Fed.

20

R. Evid. 1006. Whether to permit the use of summary evidence lies within the discretion of the district court. United States v. Richardson, 233 F.3d 1285, 1293 (11th Cir. 2000). Although Ramirez states that the charts that the government introduced into evidence were "misleading," he fails to explain how the district court abused its discretion when it admitted the charts. Ramirez does not dispute that all of the data underlying the charts was admitted into evidence and that he had an opportunity to cross-examine the witnesses who testified about the charts. No abuse of discretion occurred.

### 4. The Cumulative Error Doctrine Does Not Apply.

Ramirez argues that we should apply the cumulative error doctrine to reverse his convictions because the district court "made many grave errors . . . [that in] combination substantially prejudiced Ramirez during his trial," but we again disagree. Under the cumulative error doctrine, even if individual judicial errors would not be sufficient to warrant reversal, the defendant may have been denied a fair trial when the effect of all the errors is evaluated cumulatively. United States v. Lopez, 590 F.3d 1238, 1258 (11th Cir. 2009). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Id. (quotation omitted). Although the district court erred when it admitted the opinion testimony

21

of Prendes, Vaden, and Nelson, the opinion testimony of those witnesses was cumulative of Dr. Wohfeiler's opinion testimony that reports produced by R.A. Medical regarding blood samples were illegitimate and that R.A. Medical improperly treated patients.  Dr. Wohfeiler was a recognized expert in the field of HIV; Prendes, Vaden, and Nelson were not.  Ramirez was not deprived of a fundamentally fair trial.

### D.  The District Court Did Not Err When It Sentenced Ramirez.

Ramirez presents three different arguments about his sentence.  He challenges two enhancements applied by the district court, and he argues that his sentence is unreasonable.

Ramirez argues that the district court clearly erred when it applied a two-level enhancement for obstruction of justice, U.S. Sentencing Guidelines Manual § 3C1.1, but the record establishes otherwise.  Section 3C1.1 provides that "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." Id.  Ramirez argues that his deposition testimony from the civil forfeiture proceeding should

22

not have been used to support the enhancement under section 3C1.1 because he was experiencing physical and mental problems during the deposition due to the 2006 car accident. The only evidence presented at the sentencing hearing about Ramirez's mental state during the deposition in the forfeiture case was the testimony of Dr. Betancourt, and he found that Ramirez's impairment of memory was minor.

Ramirez also challenges the two-level enhancement based on the finding that his offense involved a "conscious or reckless risk of death or serious bodily injury," id. § 2B1.1(b)(14)(A), but this argument fails. Ramirez argues that the application of the enhancement was improper because "[t]here was no testimony that any patient was actually harmed" by the infusions that he gave to patients, but we rejected an identical argument in United States v. Mateos, 623 F.3d 1350, 1371 (11th Cir. 2010). As we explained in Mateos, "[e]ven though there was no evidence that any patient was actually harmed from the treatments, the enhancement was nevertheless appropriate because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result." Id. at 1371.

Ramirez argues too that the his sentence is "procedurally and substantively unreasonable," but we disagree. The district court considered the relevant sentencing factors and adequately explained the reasons for imposing the sentence,

23

and Ramirez's 210-month sentence is substantively reasonable.  Contrary to Ramirez's representations to the Court, the district court explicitly stated that it had considered Ramirez's diagnosis with cancer, the statements of Ramirez's wife, and Ramirez's contributions to the community in reaching its sentence, but the district court reasonably ruled that the serious nature of Ramirez's offense, Ramirez's disregard for the safety of his patients, and the need to provide adequate deterrence and protect the public outweighed these mitigating circumstances.  The district court did not abuse its discretion when it sentenced Ramirez to 210 months of imprisonment, which was in the middle of the guidelines range of 188–235 months.

## IV. CONCLUSION

We **AFFIRM** Ramirez's convictions and sentence.