RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

JOHN M. HIGGINS; CAROL HIGGINS; WEATHERGUARD,
INC.,

>   *Plaintiffs-Appellants*,

>   *v.*

KENTUCKY SPORTS RADIO, LLC; MATTHEW H. JONES;
DREW FRANKLIN,

>   *Defendants-Appellees*.

┐
│
│
│
│
│
│
> No. 19-5409
│
│
│
│
│
│
┘

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00043—Joseph M. Hood, District Judge.

Argued:  January 30, 2020

Decided and Filed:  February 27, 2020

Before:  SUTTON, BUSH, and READLER, Circuit Judges.

―――――――――

## COUNSEL

**ARGUED:**  Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellants.  Jason Renzelmann, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellees.  **ON BRIEF:**  Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, John P. Passarelli, Carol A. Svolos, KUTAK ROCK LLP, Omaha, Nebraska, for Appellants.  Jason Renzelmann, Griffin Terry Sumner, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Americans take college sports seriously, sometimes too seriously. John Higgins refereed an Elite Eight game of the NCAA Basketball Tournament in 2017. The close contest between the Kentucky Wildcats and the North Carolina Tar Heels ended when the Tar Heels scored with less than a second on the clock. Kentucky's coach was not happy and thought the referees, John Higgins in particular, had done his team no favors. The Kentucky faithful, the fans that is, were even less happy. Before long, Higgins' roofing business suffered losses of its own, after he became the target of an online campaign orchestrated by Kentucky fans who pinned the loss on Higgins. Higgins returned the favor by suing Kentucky Sports Radio and some of its contributors for his business losses, alleging that their post-game coverage of him and his roofing business incited the harassment. But the First Amendment safeguards the radio station's right to comment on Higgins' performance and the fans' reaction to it and that is so even if the station and its hosts might have exercised their First Amendment rights more responsibly. We affirm the district court's dismissal of his claims.

I.

Devoted sports fans are not known for their evenhandedness in judging referees. The sign of a true fan, it might even be said, is the hopelessness of attaining such equanimity. Veteran referee John Higgins surely was no stranger to this phenomenon before March 26, 2017. But what he experienced after that day's game was extraordinary all the same.

The Wildcats and their supporters were upset about the outcome of the closely fought contest. They directed much of their frustration towards Higgins. "You know," Wildcats Coach Calipari said in a post-game press conference, "it's amazing that we were [competitive] in a game where [the referees] practically fouled out my team." R. 55 at 3–4. "Amazing," he added, "that we had a chance." *Id.*

After the game, Higgins gained a high-profile critic in Matthew Jones. A popular talk show host, Jones runs a two-hour, call-in show on Kentucky Sports Radio, which broadcasts to

over 40 Kentucky stations.  In his post-game coverage, Jones criticized the way Higgins called fouls and didn't call them.  He described the officiating as "putrid," and pointed out that Higgins had been "part of some of Kentucky's most painful losses." *Id.* at 4.  He added that he sat behind Kentucky's coach for the game and the coach claimed the Wildcats "got jobbed in the officiating [of the] fouls." *Id.*

Soon after the game, fans discovered that Higgins owned a roofing business: Weatherguard Roofing.  Its URL is www.rooferees.com, a portmanteau of "roof" and "referee." A video posted by an anonymous user, titled "John Higgins['] Sabotage of Kentucky," depicted Higgins standing by a truck bearing the insignia of his business.  In text at the bottom of the video, it suggested that viewers "[w]rite a review of him here[:] http://www.facebook.com/ rooferees." *Id.* at 4.

The day after the game, Jones devoted airtime to Higgins' refereeing.  He read one email from a listener who contemplated "leaving a bad review on John Higgins' roofing Yelp page." *Id.*  Jones responded that this would be a "bad thing to do" and would constitute "harassment." *Id.*  Jones read another email from a listener who was "against trolling John Higgins" until he "saw the name of his roofing company." *Id.* at 5.  Jones laughed that Higgins went with the name "rooferees."  Even so, he did not "think [the fans] should troll the guy." *Id.*

That same day, Drew Franklin, a writer for Kentucky Sports Radio's website, published a series of articles criticizing Higgins' calls.  He followed up the next morning with an article commenting that Higgins' roofing business was "getting CRUSHED on its Facebook page." *Id.* He stated that he wouldn't "link the page" because he disagreed with "attacking [Higgins'] side hustle." *Id.*  He nevertheless posted a link to the video for those who could "stand to watch it." *Id.* at 6–7.  More uncharitable posts followed.  In one, he described it as a "busy day on KSR" of "contin[uing] the hatred of John Higgins." *Id.* at 7.  In another, he commented that "Kentucky fans are really lighting up John Higgins' roofing business," while reproducing some of the fake and abusive reviews that fans posted. *Id.*

Franklin added that Kentucky Sports Radio "do[es] not condone the activity" occurring on Higgins' pages. *Id.*  But at the same time, he and others reproduced at least a dozen

comments posted there.  One of those comments suggested Higgins' roofing business "takes money under the table from the mafia in Vegas." *Id.*  Another wondered if Higgins used "illegal labor, substandard materials, and shady accounting practices." *Id.*  Yet another accused Higgins of "hit[ting] on [the commenter's] 13[-]year[-]old son." *Id.*

Jones returned to the air.  He raised the topic of Higgins' Facebook page and the abusive comments posted on it.  He admitted to finding some of the comments "funny," and asked "[h]ow many of those [commenters] would like to write" for Kentucky Sports Radio.  *Id.* at 8.

In another episode that evening, Jones had a guest.  He asked his guest whether "Kentucky fans need to calm down." *Id.* at 10.  His guest laughed and said "[t]his is despicable" and that "[w]e should not act this way" before adding in a quieter voice "I love it." *Id.*  His guest followed up by stating that "what I want you to do is stop this irresponsible behavior" before whispering "please keep it up." *Id.*  Jones chuckled at each line.  He wondered whether it was "okay to post one-star reviews," *id.*, and his guest answered by saying they had "made [their] point" and suggested they move on, *id.* at 11.

The trolling campaign took a toll on Higgins' business.  It received over 3,000 phone calls in the two days after the game, with some numbers calling 40 or 50 times a day.  The calls crashed the voicemail system and made it hard for customers to get through.  Higgins received many false requests for service. Reputational harm followed.  Weatherguard Roofing went from being the top-rated roofing business in Omaha, Nebraska (with 4.8 stars out of 5 on Google), to the worst-rated (with 1.2 stars out of 5) based on the 181 false reviews placed.  (The North Carolina fans apparently did not respond by improving Higgins' ratings.)  Higgins closed his Facebook page to stem the bleeding.  Threats also came to Higgins and his family.  The business received over 800 threatening calls, and Higgins' home phone received over 30 calls.  At least a dozen provided the basis for a criminal investigation.  When Higgins refereed a Final Four game that year, a bodyguard accompanied him.

Higgins sued Jones, Franklin, and Kentucky Sports Radio, alleging intentional infliction of emotional distress, invasion of privacy, tortious interference with a business relationship, and civil conspiracy.  The defendants moved to dismiss on the ground that Higgins failed to make out

the necessary elements of any of his claims. With the court's permission, Higgins filed an amended complaint adding claims of negligence, harassment, and engaging in harassing communications. The defendants filed a new motion to dismiss, claiming that the First Amendment shielded them from liability. The court dismissed Higgins' lawsuit on that basis.

## II.

Higgins raises seven causes of action, but they all reduce to a single theory of liability. No matter the label, Higgins claims that Kentucky Sports Radio owes him money damages for its unfavorable statements about him and his roofing business after the North Carolina–Kentucky game. The First Amendment bars the theory and the claims on this record.

## A.

The First Amendment safeguards the "freedom of speech . . . [and] of the press." U.S. Const. amend. I. It does so to promote the "free flow of ideas and opinions on matters of public interest." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988). Because open channels of information must account for the possibility of "inappropriate or controversial" speech, *Rankin v. McPherson*, 483 U.S. 378, 387 (1987), the "bedrock principle underlying the First Amendment" is that states cannot prohibit speech merely because it offends the sensibilities of others, *Texas v. Johnson*, 491 U.S. 397, 414 (1989). That's why commentators may invoke the First Amendment as a "defense in state tort suits" aimed at punishing them for their speech. *Snyder v. Phelps*, 562 U.S. 443, 451 (2011).

Whether the First Amendment presumptively shields commentary from liability turns on whether the speech involves a "public or private concern." *Id.* What's a public concern? The "subject of legitimate news interest" or "a subject of general interest and of value and concern to the public." *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam). What's a private concern? Everything else. No bright line separates one from the other. Courts instead look to decisions as guideposts, assessing how the "content, form, and context" of the speech compare to the speech at issue in other cases "as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). That calls for comparisons.

Take a case on the protected side of the line. In *Snyder v. Phelps*, a religious group protested a soldier's private funeral with signs reading "Thank God for IEDs," "Thank God for Dead Soldiers," and "Thank God for 9/11." 562 U.S. at 448. Although the soldier had lived a life outside the public eye, the Supreme Court found that his funeral was not sacred in the eyes of the Free Speech Clause. The guarantee protected the religious group's activity, the Court ruled, because the signage touched on "matters of public import," such as the "political and moral conduct of the United States and its citizens." *Id.* at 454.

Take a case on the other side of the line. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, a credit agency sent a false report to a construction contractor's creditors during a bankruptcy proceeding. 472 U.S. 749, 751–52 (1985). The false report did not receive the protection of the First Amendment because the "speech" occurred "solely in the individual interest of the speaker and its specific business audience," was "made available to only five subscribers" who could "not disseminate it further," and bore no relation to a "debate on public issues." *Id.* at 762.

B.

Kentucky Sports Radio's coverage of Higgins falls on the protected side of the line. Sports like basketball make up a "multi-billion-dollar business" nationwide. *See Mayer v. Belichick*, 605 F.3d 223, 237 (3d Cir. 2010). And "prominent sports program[s]" at "major public universit[ies]" count as "matters of great . . . interest to a community." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006) (quotation omitted). Think of the March Madness tournament. Advancing into the later rounds of the tournament may change a university's financial fortunes and sometimes improve its admissions statistics. Even in the buttoned-down context of antitrust law, the Court has described sports as the "tinder for recaptured thrills, for reminiscence and comparisons, and for conversation and anticipation." *Flood v. Kuhn*, 407 U.S. 258, 262 (1972). Public commentary about sports, some have said, is no less protected than commentary about "economics [or] politics." *Regan v. Time, Inc.*, 468 U.S. 641, 678 (1984) (Brennan, J., concurring in part and dissenting in part, joined by Marshall, J.). That sports coverage implicates public concerns is "amply demonstrated by the elaborate sports section in every daily newspaper published in this nation" and by the "numerous

periodicals . . . exclusively devoted to sports." *Time, Inc. v. Johnson*, 448 F.2d 378, 383 (4th Cir 1971).

These same considerations place officiating within the sphere of public concern. Whether true or perceived to be true, a referee's calls can "change the outcome of [a] game." *Mayer*, 605 F.3d at 236. When they do, fans have every right to read about, and discuss, the "manner" in which the referees called the game. *Id.* at 237. Courts have long acknowledged that criticism comes with the territory. *See, e.g.*, *King v. Burris*, 588 F. Supp. 1152, 1157 (D. Colo. 1984); *Toone v. Adams*, 137 S.E.2d 132, 136–38 (N.C. 1964); *Parks v. Steinbrenner*, 131 A.D.2d 60, 64 (N.Y. App. Div. 1st Dep't 1987); *see also Spence v. Flynt*, 816 P.2d 771, 788 (Wyo. 1991) (Golden, J., concurring in part and dissenting in part).

Criticizing umpires serves other purposes, perhaps even healthy ones. It allows fans to suppress two unwelcome thoughts: that their team deserved to lose or that a lot of chance drives the fortunes of a team in a single-elimination tournament. How much better, after a dispiriting end-of-season loss, to be consoled by the thought that your team was robbed.

Long before the arrival of the sports-industrial complex, Americans have channeled these emotions into heated, though usually temporary, criticism of referees. "Kill the umpire!" in *Casey at the Bat* says it all—an unwillingness to criticize the hometown hero, a redirection of frustration, and, one hopes, some poetic license. Ernest Lawrence Thayer, *Casey at the Bat: A Ballad of the Republic Sung in the Year 1888* (1888). Baseball pioneer Albert Spalding went so far as to say, and perhaps too far in saying, that fans who criticize referees "exercis[e] their democratic right to oppose tyrants." *Parks*, 131 A.D.2d at 64. And General Douglas MacArthur once expressed his pride in having "protected American freedoms" like the "freedom to boo the umpire." *Id.*

Booing has degenerated into violence in some settings. *See, e.g.*, *Toone*, 137 S.E.2d at 136; *Parks*, 131 A.D.2d at 64 n.2. Lawsuits in others. *See, e.g.*, *LeMon v. Nat'l Football League*, 277 So.3d 1166, 1167 (La. 2019) (per curiam). The arrests of referees in still others. *See, e.g.*, *Guffey v. Wyatt*, 18 F.3d 869, 870 (10th Cir. 1994). And the killings of some referees, tragic to admit, in still others. *See, e.g.*, James Queally, *Michigan Soccer Referee Dies After*

*Being Attacked During a Match*, L.A. Times (July 1, 2014), https://www.latimes.com/nation /nationnow/la-na-nn-michigan-soccer-ref-20140701-story.html.

All of this deserves coverage. Just as commentators must be able to discuss the quality of the officiating, they must be free to comment on the fans' reaction to the officiating. That means Kentucky Sports Radio could fairly discuss the game—and could freely criticize those who participated in it, including the referees, the coaches, the players, the fans, and for that matter the commentators. For Kentucky sportscasters, Higgins' calls and the public's reactions to them may have been the biggest story of the news cycle. Sure, some Kentucky fans likely tuned in to Kentucky Sports Radio's coverage of Higgins solely for the schadenfreude. But even if its discussion served only that purpose, the discussion's "inappropriate or controversial character" would not influence our analysis as to "whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387.

Higgins objects that, whatever Kentucky Sports Radio's gripes about him, it should have left his roofing business out of it. But the commentators did not attack the business in its own right; they discussed it in the context of their general issues with Higgins, which concerned "the way [he] called the game." R. 55 at 11. Higgins for what it's worth did not treat Weatherguard Roofing as a purely private matter himself. He used his visibility and status as a referee to secure business, selecting "rooferees.com" to capitalize upon it. He cannot seek damages from pundits who called attention to the existence of a business that he promoted with his status as a referee before that became a liability.

Higgins also targets a bootstrapping problem. He argues that Kentucky Sports Radio fanned the flames of his harassment, and therefore cannot use the fact of his harassment to justify continued coverage. He's correct that an entity sued for its speech cannot "by [its] own conduct" make "the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). But Kentucky Sports Radio had an adequate freestanding justification for its coverage: the high-profile game Higgins officiated. And even without this justification, the adverse fan reaction preceded its coverage, as a fan posted the video that identified Higgins' roofing business *before* Jones' post-game show and the fan community anonymously coordinated retaliation online without the station's prodding.

C.

That Kentucky Sports Radio commented on a matter of public concern solves half of the puzzle. Because not all such speech receives "immun[ity] from sanction in the form of damages," *Hustler*, 485 U.S. at 52, Higgins could yet prevail if he placed Kentucky Sports Radio's speech within an established carve-out from First Amendment protection. He identifies two possible exceptions. Neither one allows his claims to proceed.

*Incitement to lawlessness.* States have long possessed power to "proscribe advocacy" of illegal conduct. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). But the First Amendment limits them to punishing only those words that are "directed to inciting or producing imminent lawless action." *Id.* Incitement requires three showings by the plaintiff: (1) that the speech "explicitly or implicitly encouraged . . . lawless action," (2) that "the speaker intends that his speech will result in . . . lawless action," and (3) that "the imminent use of . . . lawless action is the likely result of his speech." *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc).

Higgins loses on the first prong. Speech that does not "specifically advocate" for listeners to take unlawful action does not constitute incitement. *Id.* at 245. Even if communications have the "tendency . . . to encourage unlawful acts," and even if the speaker intended the communications to have that effect, those facts do not furnish a "sufficient reason for banning" the communications, absent direct advocacy. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). Higgins has not identified any statement made by the defendants, explicitly or implicitly, that fans should attack his business.

Size up Kentucky Sports Radio's conduct with the benchmarks the Supreme Court has set for us. In *Brandenburg v. Ohio*, the Court analyzed a conviction under a state statute that criminalized "advocat[ing] the duty, necessity, or propriety of . . . violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." 395 U.S. at 444–45. In holding the statute facially unconstitutional, the Court drew a distinction between suggesting the "moral propriety" of violence and "preparing a [specific] group for violent action." *Id.* at 448 (quotation omitted). "Fail[ing] to draw this distinction," it held, condemns speech that "our

Constitution has immunized from governmental control." *Id.* Just as the First Amendment protects endorsements of lawlessness that do not contain a specific call to action, so too does it shield Kentucky Sports Radio from liability for its occasional approval, and sometimes facetious approval, of the fans' over-the-top behavior.

Likewise, in *Hess v. Indiana*, a protester in an angry mob yelled "[w]e'll take the f[------] street again." 414 U.S. 105, 107 (1973). The Supreme Court found that this statement amounted at worst to "advocacy of illegal action at some indefinite future time," which lacked the particularity necessary to prevail under the *Brandenburg* standard. *Id.* at 108. If that statement did not expose the speaker to liability, Kentucky Sports Radio's conduct steers well clear of the line.

Or look to our own case, *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018). President Trump identified disruptive members of the audience at a rally and told the crowd to "[g]et 'em out of here," a sentiment he "repeated several times." *Id.* at 606, 611. This led some individuals to rough up the protesters. We concluded that these statements could not constitute incitement, even though they may have "encourage[d the] unlawful use of force" in the "ears of some supporters." *Id.* at 610, 612. While his statements did call for direct action, they came only in response to a "disturbance" already underway and were addressed only to "unidentified listeners" in the crowd. *Id.* at 611–12. The same goes for Kentucky Sports Radio. Its commentary came only after the first round of fan retaliation. Unlike the statements made in *Nwanguma*, the ones at issue did not call for action from anybody.

*Nwanguma* raises another hurdle for Higgins. President Trump's follow-on statement "don't hurt 'em," we reasoned, amounted to an "express disavowal" and "discouragement" of lawless behavior. *Id.* at 612. The restraining phrase "neutraliz[ed]" any "inciting tendency of [his] words." *Id.* That same logic applies today. While the announcers at Kentucky Sports Radio do not merit prizes for sensitivity and restraint, they did make at least six statements that discouraged the fans' conduct. Jones told his listeners that posting unfavorable reviews was a "bad thing to do" and would constitute "harassment." R. 55 at 4. He stated he was "against trolling John Higgins." *Id.* at 5. He stated he "did not 'advocate'" for the fans' retaliatory activity. *Id.* at 8. And he "advis[ed]" fans not to call Higgins' roofing company. *Id.* at 9.

Franklin, for his part, wrote an article stating that he did not "completely agree with attacking [Higgins'] side hustle." *Id.* at 6. And, in perhaps the clearest articulation of Kentucky Sports Radio's stance, he added: "We here at [Kentucky Sports Radio] do not condone activity from Big Blue Nation on John Higgins' roofing company's Facebook page." *Id.* at 7.

Higgins persists that Jones' decision to read the bad reviews on the air after "admitt[ing] that the co-conspirators' actions amounted to 'harassment'" crossed the line. Appellant Br. 18. But Jones told listeners in that same discussion that continuing to target Higgins was a "bad thing" to do. R. 55 at 4. Backing his point up, Higgins points to an instance when Jones said that "maybe [he and his colleagues at Kentucky Sports radio] were to blame" for the fans' conduct. Appellant Br. 18. But context matters. He said that the comments on the Facebook page were "not prompted by" him and that you "cannot blame" Kentucky Sports Radio for them, before facetiously adding: "Well, maybe you can because I told you he was a roofer." R. 55 at 8. The first part of this statement notes Jones' opposition to the harassment. The second part assumes blame only for notifying fans that Higgins ran a roofing business using the tagline "rooferees," information already made public before their coverage of the game and a label that by its nature gets First Amendment protection.

Higgins points to an exchange in which a guest on Jones' show stated that "[w]e have made our point," a sentiment with which Jones agreed. *Id.* at 11. But read in view of the surrounding discussion, this dialogue most naturally refers to their decision to discuss Higgins' refereeing. The guest offered one final comment on Higgins, saying that he was "still pretty hung up about the way [Higgins] called the game" before adding that they should "move on." *Id.* None of that shows Jones took responsibility for Higgins' harassment.

Higgins adds that, even if the members of Kentucky Sports Radio technically said the right things, they nevertheless encouraged his harassment by dogwhistling to their fans, telling them to leave him alone only with a wink and a nod. It may be that pervasive sarcasm could transform innocent speech into incitement. Say a speaker provided step-by-step instructions encouraging lawlessness, each preceded with a sardonic "not." For instance: "I do *not* want you to visit Higgins' Facebook page, I do *not* want you to leave a one-star review, I do *not* want you to do all that as soon as you get off work, and I do *not* want you to tie up his phone lines." But

that doesn't describe this case. Kentucky Sports Radio did not advocate for Higgins' harassment. Nor did its disavowal of the fans' conduct smack of irony—usually. Yes, it did a poor job dissuading listeners from mischief. But a party cannot be sued for incitement merely because it failed to condemn the behavior of others with sufficient firmness or clarity.

That leaves Higgins to claim that Kentucky Sports Radio should have self-censored given the context. But we may consider only the context of the speech itself: "what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454. We cannot curtail a speaker's First Amendment protection on the grounds that an otherwise permissible message might touch a nerve with an easily agitated audience. If we applied that standard, few could speak freely. The internet is a "vast and often unpleasant place." *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494 (6th Cir. 2019). The public has the right to know about that unpleasantness. It follows that parties reporting on that unpleasantness cannot be sued simply for failing to condemn it strenuously enough. Any other approach would especially burden the speech most in need of a safe harbor: discussions of hot-button and divisive social issues. *See Snyder*, 562 U.S. at 451–52.

All of this means that Kentucky Sports Radio's communications fell short of incitement. Even so, "a few words" about common decency are in order. *United States v. James*, 328 F.3d 953, 957 (7th Cir. 2003). Kentucky Sports Radio knew, or surely should have known, the volatility of the situation. One can cover a gasoline spill without adding needless sparks. Even with the platform to make a difference, the station did more to fan the flames of discontent than to extinguish them. The Constitution protects that choice. A conscience must do the rest.

*Defamation.* Higgins separately claims that Kentucky Sports Radio engaged in a "conspiracy to defame" him using its listeners as co-conspirators. A claim of this sort appears nowhere in Higgins' amended complaint. Quite the contrary: Higgins argued before the district court that he was "not bring[ing] a defamation claim." R. 57 at 29. He nevertheless says that, because Kentucky Sports Radio did not expressly respond to his conspiracy-to-defame theory in its Supplemental Motion to Dismiss, it has now forfeited its right to seek dismissal of that theory on appeal. Not so. Kentucky Sports Radio's motion asserts that the First Amendment would

preclude "all of [Higgins'] claims" because the statements he objects to "relate to matters of public concern" and because "Higgins is a public figure." R. 56 at 2. All means all.

Once that procedural objection falls away, Higgins' conspiracy-to-defame theory disintegrates. We will assume, for the sake of argument, that Kentucky law might recognize such a tort. But even this premise stands on sandy ground. The Kentucky Supreme Court has never directly weighed in on the question, and its only references to a tort of conspiracy to defame rest on century-old dicta. *See, e.g.*, *Rollins v. Louisville Times Co.*, 90 S.W. 1081, 1083 (Ky. 1906); *Pauley's Guardian v. Drain*, 6 S.W. 329, 330 (Ky. 1888).

Whatever the status of this tort under Kentucky law, a plaintiff could not prevail under it without carrying the same First Amendment burden he must carry in a garden-variety defamation case. *See Windsor v. The Tennessean*, 719 F.2d 155, 161 (6th Cir. 1983); *Stern v. U.S. Gyspum, Inc.*, 547 F.2d 1329, 1342–43 (7th Cir. 1977). That means Higgins must be able to show that Kentucky Sports Radio acted with "actual malice"—that it knowingly made false statements or acted with reckless disregard to the truth of its statements. *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964). His amended complaint fails to do that. Merely repeating potentially false reviews generated by other users may be in bad taste. But it cannot by itself constitute defamation. And good thing too. If it could, any news article discussing a tendentious Twitter exchange could land its author in front of a jury. That would make the authors of the First Amendment cringe.

D.

Higgins advances other arguments too. He claims that the district court improperly engaged in research outside the record, and that it improperly speculated about the meaning of the Kentucky Constitution. But we need not reach these issues because the First Amendment would still require us to dismiss Higgins' claims in any event.

\* \* \*

Perceived missteps in the public eye these days all too often unleash torrents of anonymous online hate. One can hardly blame the victim of such onslaughts for wanting redress. Or blame him for taking aim at the only members of the mob with faces: pundits like Jones and like Franklin who at times took too much glee in reporting on the misery of others. But a gulf lies between commenting on harassment and causing it. And in that respect, the First Amendment protects the rights of sports radio talk show hosts just as it protects the rights of presidents. Those who step into the public limelight, even temporarily, must face the hazard that sometimes comes with it. Should they find a commentator's discussion of their foray into public life unsavory, they cannot easily "cry 'Foul!'" *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 274 (1971).

We affirm.